Anthony T. LEE and Henry A. Lee, by Detroit Lee and Hattie M. Lee, their parents and next friends et al., Plaintiffs,

United States of America, Plaintiff-Intervenor and Amicus Curiae,

v.

MACON COUNTY BOARD OF EDUCATION et al., Defendants.

Civ. A. No. 604-E.

United States District Court
M. D. Alabama, E. D.

March 22, 1967.

Fred D. Gray (Gray & Seay), Montgomery, Ala., Jack Greenberg, Charles H. Jones, Jr., Melvyn Zarr and Henry M. Aronson, New York City, for plaintiffs.

Ben Hardeman, U. S. Atty., Montgomery, Ala., John Doar, Asst. Atty. Gen., and St. John Barrett, Brian K. Landsberg, Robert D. Owen and John M. Rosenberg, Attys., United States Dept. of Justice, Washington, D. C., for the United States.

Richmond M. Flowers, Atty. Gen., and Gordon Madison and Robert P. Bradley, Asst. Attys. Gen., of Alabama, Montgomery, Ala., for the Macon County Board of Education and individual members.

Maury D. Smith, O. J. Goodwyn, John S. Bowman and Charles M. Crook (Goodwyn, Smith & Bowman), Montgomery, Ala., John C. Satterfield, Yazoo City, Miss., and A. Hugh Maddox, Legal Adviser to Governor Wallace, State of Alabama, Montgomery, Ala., for George Wallace [Lurleen Burns Wallace] as Governor and as President of the Alabama State Board of Education.

Maury D. Smith, O. J. Goodwyn, John S. Bowman and Charles M. Crook (Goodwyn, Smith & Bowman), Montgomery, Ala., Marion Rushton and James Garrett (Rushton, Stakely & Johnston), Montgomery, Ala., for Alabama State Board of Education and individual members.

Before RIVES, Circuit Judge, and GROOMS and JOHNSON, District Judges.

PER CURIAM.

In these supplementary proceedings, this Court is once again called upon to consider whether the defendants[1] Lurleen Burns Wallace as Governor of the State of Alabama and as President of the Alabama State Board of Education, Ernest Stone as Secretary and Executive Officer of the Alabama State Board of Education (sometimes referred to as the State Superintendent of Education), and the individual members of the Alabama State Board of Education, have continued, and are continuing, to use their authority to operate throughout the State of Alabama a dual school system based on race.

This Court is also once again called upon to pass upon the constitutional validity of a tuition grant law (Title 52, § 61(8), Code of Alabama) passed by the Legislature of the State of Alabama and approved by the Governor on September 1, 1965.

## I. PROCEDURAL HISTORY

This action was commenced over four years ago by Negro parents of school-age children, against the Macon County Board of Education, seeking to desegregate the public schools in Macon County, Alabama. In July 1963 the United States was added as a party and as amicus curiae in order that the public interest in the administration of justice would be represented. After a full hearing, this Court in August 1963 made its findings and conclusions and ordered the public schools in Macon County, Alabama, desegregated. Lee, et al. (Plaintiffs, United States of America, Plaintiff and Amicus Curiae) v. Macon County Board of Education, MD Ala., August 22, 1963, 221 F.Supp. 297. Thereafter, on three separate occasions during the 1963–64 school year, this Court found it necessary to enjoin state officials from various forms of interference with the peaceful and orderly desegregation of schools in Macon County.[2]

In February 1964 plaintiffs filed a supplemental complaint, adding as defendants George C. Wallace as President of the Alabama State Board of Educa-

---

[1]. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, this Court on January 23, 1967, ordered that Lurleen Burns Wallace in her capacity as Governor of the State of Alabama and as President of the Alabama State Board of Education, Ernest Stone, Secretary and Executive Officer of the Alabama State Board of Education; Ed Dannelly and Mrs. Carl Strang as members of the Alabama State Board of Education, be substituted as defendants for the named defendants George C. Wallace, Austin R. Meadows, J. T. Albritton and J. P. Faulk, Jr., respectively.

[2]. United States v. Wallace, D.C., 222 F. Supp. 485 (September 1963); Lee v. Macon County Board of Education, order of February 3, 1964; United States v. Rea, D.C., 231 F.Supp. 772 (February 1964).

tion, Austin R. Meadows, Executive Officer and Secretary of the Alabama State Board of Education, and other individual members of the State Board of Education. In this supplemental complaint the plaintiffs requested this Court (1) to enjoin these defendants from operating a dual school system based upon race throughout the State of Alabama, (2) to enter an order requiring state-wide desegregation of schools in the State of Alabama, (3) to enjoin the use of state funds to perpetuate the dual school system, and (4) to enjoin as unconstitutional the tuition grant law of the State of Alabama (Chapter 4B [§§ 61(13) through 61(21)], Title 52, Code of Alabama). At this stage of the proceeding, the Chief Judge of the United States Court of Appeals for the Fifth Circuit, in response to a request of the district judge, constituted a three-judge court pursuant to §§ 2281 and 2284, Title 28, United States Code.

After an oral hearing, a review of the evidence and arguments of counsel, this Court in July 1964 [3] made its findings and conclusions to the effect that there was a dual school system based upon race that was maintained and operated throughout the State of Alabama and that it was the policy of the state and, in particular, the Governor, George C. Wallace, as President of the Alabama State Board of Education; Austin R. Meadows, Secretary and Executive Officer of the Alabama State Board of Education, and the individual members of the Alabama State Board of Education, to promote and encourage the implementation of that racial policy in the operation of the Alabama public schools. It was also concluded that Alabama's tuition grant law was nothing more than a sham established for the purpose of financing with state funds a white school system in the State of Alabama. Ac-

cordingly, the defendant state officials were enjoined from:

Interfering with, preventing or obstructing by any means, the elimination of racial discrimination by local school officials in any school district in the State of Alabama;

Approving, authorizing or paying any tuition grant or grant-in-aid under the provisions of Chapter 4B [Sections 61(13) through 61(21)] of Title 52 of the Alabama Code for the attendance of any person in a school in which enrollment or attendance is limited or restricted upon the basis of race or color;

Failing, in the exercise of its control and supervision over the public schools of the State, to use such control and supervision in such a manner as to promote and encourage the elimination of racial discrimination in the public schools, rather than to prevent and discourage the elimination of such discrimination.

In August 1966 the United States of America was permitted to file a supplemental complaint in intervention wherein the United States as a party attacked the constitutionality of Alabama's new tuition grant statute [4] passed after this Court enjoined, in its order of July 1964, the paying of any tuition grant or grant-in-aid under the provisions of Chapter 4B, Title 52 of the Alabama Code. The complaint in intervention by the United States attacked the new statute on the basis that it was for no purpose other than to perpetuate racial segregation in the public schools of Alabama. This aspect of the case was submitted on stipulation and is discussed later in this opinion.

In September 1966 and in November 1966, the plaintiffs filed additional supplemental complaints again asking for a state-wide desegregation order and an injunction against the use of state funds

---

3. Lee et al. (Plaintiffs, United States of America, Plaintiff and Amicus Curiae) v. Macon County Board of Education, MD Ala., July 13, 1964, 231 F.Supp. 743.

4. The 1965–66 tuition grant laws were not in the form of amendments to the old tuition grant statute; instead, they were designated as § 61(8), Title 52, Code of Alabama.

to support a dual school system. Following extensive discovery by all parties, the case was heard in November 1966 and is now submitted upon the evidence and the parties' oral arguments and briefs.

## II. FACTUAL HISTORY

In the July 1964 order, this Court found that the defendant George C. Wallace, President of the Alabama State Board of Education, the State Board of Education, the several individual members thereof, and the Secretary and Executive Officer of the Alabama Board of Education, Austin R. Meadows, had demonstrated that they had enormous authority and power over the actual operation of the various local school systems throughout the state. This conclusion was based on the actual assumption or usurpation of authority by these defendants over the local school boards exemplified by their total control, when they chose to exert it, over the Macon County school system, and also by the general statutory power granted to these various officials to supervise and control the public schools in the State of Alabama. Examples of the Governor's actions and control, as found previously by this Court, are:

As stated above, acting pursuant to this Court's order, the defendant Macon County Board of Education assigned 13 Negro pupils to the Tuskegee Public High School. These pupils were assigned in grades eight through twelve and were scheduled to begin school on September 2, 1963. Early on the morning of September 2, an Alabama State trooper visited the home of Macon County Superintendent Pruitt and presented him with an order of Governor George C. Wallace, who is also under the law of Alabama the ex officio President of the Alabama State Board of Education. This Executive Order stated, in part, as follows:

WHEREAS, there now exist in the State of Alabama conditions calculated to result in a disruption of the peace and tranquility of this State and

to occasion peril to the lives and property of the citizens thereof, this situation resulting from the threat of forced and unwarranted integration of the public schools of this State; and,

\* \* \* \* \* \*

NOW, THEREFORE, I, George C. Wallace, as Governor of the State of Alabama, and in conformity with the Constitutional and statutory power vested in me as Governor of said State, do hereby order and direct the Macon County Board of Education, Macon County, Alabama, to delay the opening of Tuskegee High School for a period of one week, until, to-wit: Monday, September 9, 1963, with the sole and express purpose of allowing the Governor of the State of Alabama to preserve the peace, maintain domestic tranquility and to protect the lives and property of all citizens of the State of Alabama.

DONE this the 2nd day of September, A. D., 1963

/s/ George C. Wallace

GEORGE C. WALLACE, AS GOVERNOR OF THE STATE OF ALABAMA

Acting upon this direction of Governor Wallace, the State troopers surrounded the Tuskegee High School, and neither the pupils nor teachers were permitted to enter the school. Tuskegee High School remained closed for one week. On September 9, 1963, Governor Wallace issued another Executive Order, which stated, in part:

NOW, THEREFORE, I, George C. Wallace, as Governor of the State of Alabama, and in conformity with the Constitutional and statutory power vested in me as Governor of said State, do hereby order and direct that no student shall be permitted to integrate the public schools of the City of Tuskegee, Alabama.

\* \* \* Governor Wallace announced publicly that the State Legislature had provided for grants-in-aid to private schools and assured the organizers of the Macon Academy that

the Macon County Board of Education would cooperate in making grants-in-aid available through the use of its statutory authority to provide such aid to students in lieu of operating a particular public school.

Examples of the actions and control of the State Board of Education and its executive officers, as previously found by this Court, are:

In January, 1964, the Alabama State Board of Education passed the following resolution:

BE IT RESOLVED That the State Board of Education hereby orders that Tuskegee High School be closed, all grades above the seventh grade, and that the teachers be transferred to other schools in the Macon County School System and the children transferred to other schools in the Tuskegee area, in accordance with the State Board of Education policy of closing schools where the teacher load is not sufficient to justify paying teachers, and in accordance with Title 52, Code of Alabama, 1940, as amended; and

BE IT FURTHER RESOLVED That the Alabama State Board of Education hereby orders the Macon County Board of Education to provide school bus transportation for the children attending the Shorter and Notasulga schools in Macon County.

On the same date, this resolution was wired by the State Superintendent of Education to the Macon County Superintendent of Education. In the same session, the State Board directed the Governor to take whatever steps were necessary to execute its directive to close the Tuskegee Public High School above grade seven. In compliance with the directive of the State Board, the County Board of Education closed the Tuskegee High School effective February 3, 1964, and directed that all students then attending Tuskegee High School (12 Negro and no white students) be transferred to other schools in the "Tuskegee area." The County

Board of Education further directed that the teachers of the Tuskegee High School be assigned to such other schools in the county as might be designated. The effect of the State Board's resolution facilitated the transportation of white children to the "all white" Shorter and Notasulga schools and by limiting the Negro pupils to "other schools in the Tuskegee area," required them to return to the "all Negro" Tuskegee Institute High School in Tuskegee, Alabama. When on February 3, 1964, the Negro pupils were barred from the Tuskegee High School, this Court upon proper motion, issued a temporary restraining order, the effect of which did not require the reopening of the Tuskegee High School for the 12 Negro pupils, but ordered these Negro pupils admitted to Shorter and Notasulga on the same basis as the white pupils who were transferred from the Tuskegee High School when the Negro pupils first attended in September, 1963.

In February, 1964, the State Board of Education adopted other resolutions directing the Macon County Board to provide financial assistance under the grant-in-aid law:

BE IT RESOLVED That the Macon County Board of Education is directed to forthwith, February 4, 1964, provide financial assistance to parents or guardians of students under the grant-in-aid law of the State of Alabama as set forth in Title 52, of the 1940 Code of Alabama, as amended.

BE IT RESOLVED That the State Board of Education deplores the order of Judge Johnson and pledges every resource at our command to defend the people of our State against every order of the Federal court in attempting to integrate the public schools of this State and will use every legal means at our command to defeat said integration orders and pledges our full support to the local boards of education in supporting the public school system as

now constituted with the law, and will give every assistance possible to support every effort to maintain our way of life and high educational standards for all citizens of our State.

Based upon such findings as reflected by the evidence, this Court found that "the State of Alabama has an official policy favoring racial segregation in public education," and that, strictly in accordance with this official policy, "the State of Alabama has operated and presently operates a dual school system based upon race." In the July 1964 order, the Court further found and concluded that "the purpose of the said State officials, as evidenced by their actions already recited, was clearly to prevent or impede any desegregation through their unlawful interference with the city and county school boards' attempting to comply with the law." It was only "through the exercise of considerable judicial restraint" that this Court refrained in July 1964 from requiring these defendant state officials to exercise their control and authority over the various local school boards throughout the state for the purpose of desegregating the school systems on a state-wide basis and to enjoin said defendants from using state funds for the purpose of perpetuating a dual school system based upon race. The exercise of restraint in that instance was prompted by the desire on the part of each member of this Court to afford these defendants every opportunity to comply in good faith with their affirmative constitutional duty to desegregate the state's public schools. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Board of Public Instruction of Duval County, Fla. v. Braxton, 326 F.2d 616, 5th Cir. 1964, cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216. We were, however, careful to admonish:

> Needless to say, it is only a question of time until such illegal and unconstitutional support of the segregated school systems must cease. These State officials and the local school officials are now put on notice that within a reasonable time this Court will expect and require such support to cease. These school officials should now proceed to formulate and place into effect plans designed to make the distribution of public funds to the various schools throughout the State of Alabama only to those schools and school systems that have proceeded with "deliberate speed" in the desegregation of their schools and school systems as required by Brown v. Board of Education [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873], supra.

### III. THE MERITS

Over two and one-half years have now elapsed since that order was entered. During this period the focus on the rights of American citizens, regardless of their race or color—and in particular on the right of Negro children to attend public schools without discrimination on account of their race of color—has increasingly sharpened. The Congress of the United States in Public Law 88–352, 78 Stat. 241 (Civil Rights Act of 1964) has declared it to be a national policy that students shall have the right to attend public schools without regard to their race, color, religion or national origin; that the term "public school" means any elementary or secondary educational institution, or any institution of higher education or any technical or vocational school above the secondary school level operated by a state, subdivision of a state, or governmental agency within a state, or operated through the use of governmental funds.[5] The Attorney General was given authority to institute suits against school systems for the purpose of furthering "the orderly achievement of desegregation in public education * * *."[6] With the knowledge that the public school systems throughout the United States were receiving federal financial assistance in large quantities, the Congress declared, "No person in the United States shall, on the ground of race, color, or national

---

5. Title IV, §§ 401–406.

6. Title IV, §§ 407–410.

origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[7] Negroes themselves have begun filing individual lawsuits in greater volume that ever before, for the purpose of desegregating public school facilities. These various efforts, insofar as the Alabama school system is concerned, have met the relentless opposition of these defendant state officials. Not only have these defendants, through their control and influence over the local school boards, flouted every effort to make the Fourteenth Amendment a meaningful reality to Negro school children in Alabama; they have apparently dedicated themselves and, certainly from the evidence in this case, have committed the powers and resources of their offices to the continuation of a dual public school system such as that condemmed by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). As a result of such efforts on the part of those charged with the duty and responsibility under the law as announced in 1954 by the Supreme Court in *Brown*, by the Congress of the United States in the Civil Rights Act of 1964, and, more specifically, by this Court in its July 1964 order, today only a very small percentage of students in Alabama are enrolled in desegregated school systems.[8]

Based upon this fact and a continuation of such conduct on the part of these state officials as hereafter outlined, it is now evident that the reasons for this Court's reluctance to grant the relief to which these plaintiffs were clearly entitled over two years ago are no longer valid.

It is considered appropriate to restate the general scope of the control and authority of these defendant officials over the public schools in Alabama. As

noted earlier, the defendant officials have extensive powers over this public school system. Section 262 of the Alabama Constitution provides that "The supervision of the public schools shall be vested in a superintendent of education, whose powers, duties * * * shall be fixed by law." The State Board of Education has similar duties: "[the Board] shall exercise, through the state superintendent of education and his professional assistants, general control and supervision over the public schools of the state * * *." Title 52, § 14, Code of Alabama. The Legislature has also provided that "The state superintendent of education shall execute the educational policy of the state board of education." Title 52, § 45, Code of Alabama.

The State Board is expressly authorized to adopt rules and regulations governing school construction, school sanitation, and physical examination of school children, and must enforce all rules relating to "school health, compulsory education, and child conservation." Title 52, § 15, Code of Alabama. It controls the grading and standardizing of public schools,[9] the minimum contents of courses of study,[10] and the training and certification of teachers.[11] The State Board of Education is further charged with the duty of "equalizing the public school facilities throughout the state" and administers a fund for that purpose. Title 52, § 33, Code of Alabama. The State Board and the State Superintendent together exercise a broad power of review of actions of local school boards and local superintendents in "matters relating to finance and other matters seriously affecting the educational interest." Title 52, §§ 34 and 47, Code of Alabama.

The Board also has broad powers to effectuate and supplement other powers

---

7. Title VI, § 601.

8. The percentage of students enrolled in schools in which they are in a racial minority are: White, 0.003%; Negro, 0.34%. The 1965–66 Annual Reports to the Alabama State Department of Education reflect that of the 294,734 Negro

children attending public schools in Alabama only 1,009 were attending desegregated schools.

9. Title 52, § 16, Code of Alabama.

10. Title 52, § 17, Code of Alabama.

11. Title 52, § 20, Code of Alabama.

previously expressly conferred. Title 52, § 31, Code of Alabama.

It was on the basis of these provisions that the Supreme Court of Alabama was able to conclude: "Every public school is a state school, created by the state, supported by the state, supervised by the state, through state wide and local agencies, taught by teachers licensed by the state, employed by agencies of the state." Williams (Supt. of Banks et al.) v. State, for Use and Benefit of Pickens County et al., 230 Ala. 395, 397, 161 So. 507, 508 (1935).[12]

To maintain the racial characteristics of the Alabama public school system, the defendant state officials have used their power in essentially two ways. First, they have used their authority as a threat and as a means of punishment to prevent local school officials from fulfilling their constitutional obligation to desegregate schools, and second, they have performed their own functions in such a way as to maintain and preserve the racial characteristics of the system. No useful purpose would be served by reiterating the machinations surrounding the closing of schools in Tuskegee, Alabama, and the Governor's abortive efforts to thwart the desegregation of Tuskegee High School, since this episode is adequately set out in this Court's opinion of July 1964 (231 F.Supp. 743). Such conduct, and its continuation as hereinafter found, reveals a broad spectrum of state interference with local desegregation efforts.

Title VI of the Civil Rights Act of 1964, as stated earlier, prohibits discrimination in federally assisted programs. This law became effective July 2, 1964. In December 1964 the Secretary of Health, Education and Welfare of the United States published regulations for compliance with Title VI programs administered by his department.[13] These regulations require, among other things, that any application for federal financial assistance be accompanied by an assurance that the program will be conducted, or the facility operated, on a nondiscriminatory basis.[14]

On March 4, 1965, State Superintendent of Education Meadows submitted to the United States Commissioner of Education state-wide assurance of compliance. When Dr. Francis Keppel, United States Commissioner of Education, questioned this "assurance," the State Superintendent of Education reacted by attacking Dr. Keppel's letter through a news release to the superintendents of the local school systems throughout Alabama. Approximately two weeks after filing his state-wide assurance of compliance, Superintendent Meadows told the Alabama Teachers Association:

* * * The minority race has a new junior college in Mobile and a new one is being established in Jefferson County * * *.

* * * * * *

Every type of education facility available to the majority group in Alabama has been made available to the minority group * * *

His address ended with the following plea:

* * * Will this Nation let Alabama continue its progress, nurture its fine culture, and further its goal of peaceful existence in the only way it knows to exist or will all of this be destroyed by outsiders who either do not understand or do not care enough for either race in Alabama?

In April 1965 the United States Commissioner of Education issued "guidelines" requiring the school systems to take immediate steps to desegregate students, facilities and programs.[15] Pur-

---

12. Accord: State v. Tuscaloosa County et al., 233 Ala. 611, 172 So. 892 (1937).

13. 45 C.F.R. 80.1–80.9.

14. 45 C.F.R. 80.4.

15. Nothing said here should be construed, inferentially or otherwise, as a decision by this Court on the validity or invalidity of the 1966 guidelines as issued by the United States Commissioner of Education, since that question, and other related questions, is presently pending in a case styled Alabama NAACP State Conference of Branches, et al., Plaintiffs, United

suant to these guidelines, a number of Alabama school districts decided to desegregate all twelve grades for the 1965–66 school year. In August 1965, and after Singleton v. Jackson Municipal Separate School District, supra, Governor George C. Wallace sent the Superintendent of each such district the following telegram:

WE HAVE BEEN INFORMED THAT YOUR SCHOOL BOARD HAS VOLUNTARILY SUBMITTED A SO-CALLED COMPLIANCE PLAN COVERING ALL GRADES IN YOUR SCHOOL SYSTEM. AS YOU KNOW, WE HAVE NEVER ASKED ANY SCHOOL BOARD TO VIOLATE ANY PROVISION OF FEDERAL OR STATE LAW. IT IS OUR CONSIDERED JUDGMENT THAT ANY PLAN FOR SO-CALLED NON-DISCRIMINATION IN ALL GRADES IS BEYOND EVEN THE MINIMUM REQUIREMENTS SET BY THE U.S. COMMISSIONER OF EDUCATION. IN FACT, THE DEPARTMENT HAS ACCEPTED AS MINIMUM COMPLIANCE SOME PLANS COVERING ONLY FOUR GRADES. IT IS ALSO READILY APPARENT THAT THOSE SCHOOL SYSTEMS WHICH HAVE BEEN REQUIRED TO DESEGREGATE UNDER FEDERAL COURT ORDER ARE NOT REQUIRED TO DESEGREGATE ALL 12 GRADES IN ONE YEAR. WE

THINK IT WOULD BE ADVISABLE FOR YOUR SCHOOL BOARD TO RECONSIDER YOUR ACTION IN THE SUBMISSION OF YOUR COMPLIANCE PLAN.

On September 3, 1965, the Governor sent them another telegram:

THIS FOLLOW-UP TELEGRAM COMES AFTER A MEETING OF THE STATE BOARD OF EDUCATION WHICH PASSED A RESOLUTION YESTERDAY EXPRESSING GRAVE CONCERN ABOUT THE FUTURE OF PUBLIC EDUCATION IN ALABAMA IN VIEW OF THE FACT THAT SOME SCHOOL BOARDS HAVE GONE BEYOND THE MAXIMUM REQUIREMENTS OF COURT PRECEDENTS IN EXECUTING COMPLIANCE PLANS. WE AGAIN RESPECTFULLY CALL TO YOUR ATTENTION THAT THE EXECUTION AND ADMINISTRATION OF PLANS BEYOND THOSE REQUIRED IS NOT IN THE INTEREST OF PUBLIC EDUCATION IN THE STATE OF ALABAMA. SUCH WAS ENUNCIATED BY THE SOUTHERN GOVERNORS MEETING IN ATLANTA. IN VIEW OF THE FACT THAT UNDER THE PUPIL PLACEMENT ACT THE ADMINISTRATION AND ASSIGNMENT OF PUPILS IS YOUR PREROGATIVE, WE AGAIN RESPECTIVELY REQUEST THAT

States of America, Plaintiff and Amicus Curiae v. George C. Wallace, et al., Defendants, being heard by a separate three-judge court in this district. *Furthermore, in this case we deal solely with constitutional requirements on the part of public officials not to discriminate on the basis of race in the operation of public schools and with constitutional requirements on the part of public officials to take affirmative action to disestablish state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or encouraged racial discrimination in their activities and in their operation of the public school system in the State of Alabama.* It is felt that it is necessary, however, to discuss the conduct of some of these defendants

in connection with the compliance or noncompliance of the *1965* guidelines on the part of local school officials for the purpose of demonstrating the extent of the control exercised by these state officials over the local school boards throughout the state. In this connection, it should be noted that in June 1965 the United States Court of Appeals for the Fifth Circuit recognized the guidelines, as then issued (1965 guidelines), as "standards for compliance with the requirements of Title VI of the Civil Rights Act of 1964." Singleton v. Jackson Municipal Separate School District, 348 F.2d 729, 731. For the purpose of emphasis, we reiterate that in this case this Court is not concerned with the validity of any guidelines issued by the United States Commissioner of Education in either 1965 or 1966.

YOU TAKE WHATEVER ACTION IS NECESSARY TO SEE THAT THE ADMINISTRATION AND EXECUTION OF THESE PLANS DO NOT GO BEYOND THE REQUIREMENTS OF FEDERAL COURT ORDERS OF FIVE GRADES. WE URGE CAREFUL CONSIDERATION OF THE RESOLUTION PASSED UNANIMOUSLY BY THE STATE BOARD OF EDUCATION, A COPY OF WHICH WILL BE FORWARDED TO YOU AND WHICH WE WHOLEHEARTEDLY ENDORSE. WE COMMEND THE DILIGENT WORK OF THE GREAT MAJORITY OF LOCAL SCHOOL BOARDS WHO HAVE DONE AN OUTSTANDING JOB UNDER EXTREMELY TRYING CIRCUMSTANCES.

On September 3, 1965, Superintendent of Education Meadows sent the local school officials a copy of a resolution by the State Board of Education urging them "to take no action in the administration and execution of compliance plans which are not required by law or court order * * *." Superintendent Allen Thornton of Lauderdale County, who had attempted to justify his board's actions to the Governor, received the following telegram from the Governor:

YOUR STATEMENT TO THE GOVERNORS OFFICE ON THURSDAY SEPTEMBER 2 THAT YOU ARE SATISFIED WITH THE PUBLIC SCHOOL SITUATION IN LAUDERDALE COUNTY WHERE MORE NEGRO PUPILS ARE ENROLLED IN THE PREVIOUSLY ALL WHITE SCHOOLS THAN ARE IN EITHER OF THE LARGE CITIES OF BIRMINGHAM OR MONTGOMERY, AND YOUR FURTHER STATEMENT THAT YOU PLAN TO ELIMINATE EVENTUALLY ALL NEGRO SCHOOLS IN THE COUNTY AND TRANSFER THE PUPILS TO WHITE SCHOOLS COULD DO MORE TO DESTROY THE PUBLIC EDUCATIONAL SYSTEM OF ALABAMA THAN ANY ACTION SINCE THE INFAMOUS 1954 DECISION OF THE UNITED STATES SUPREME COURT. THOSE WHO HAVE WORKED DILIGENTLY TO RAISE SUPPORT OF PUBLIC EDUCATION TO A RECORD HIGH LEVEL IN THE HISTORY OF OUR STATE RESENT AND REJECT THIS ATTITUDE. WE CALL UPON YOU TO ALIGN YOUR POLICIES WITH THE MINIMUM REQUIREMENTS OF THE LAW AND OF COURT ORDERS. (COPIES OF THIS TELEGRAM SENT TO FLORENCE TIMES, FLORENCE, ALA., ASSOCIATED PRESS, MONTGOMERY, ALA., AND UNITED PRESS INTERNATIONAL, MONTGOMERY, ALABAMA)

These telegrams had their effect. For instance, on September 6, 1965, the Choctaw County Board of Education resolved:

That due to the change in conditions, particularly within the past few days, the Board concludes it is for the best interest of the children attending the schools of Choctaw County, Alabama, their safety and welfare, for the continued orderly operation of the schools in the County, and for the prevention of violence which would likely result in serious consequences adversely affecting the orderly operation of the schools, the plan of desegregation of the schools of Choctaw County, Alabama, adopted by this Board on August 23, 1965, be and the same is hereby revoked.

The reaction of these defendant state officials and their conduct and the responses by the local school officials concerning the 1966 guidelines issued on March 7, 1966, by the United States Department of Health, Education and Welfare, for the reasons set forth by this Court in footnote 15, supra, will not be made a part of the findings and conclusions of this Court in this case.

Conduct on the part of these state officials to thwart desegregation of the public school system in the state continued, and on July 1, 1966, Alabama State Superintendent of Education Meadows expressed his views on segregation in a parable which he circulated to each lo-

cal superintendent of education throughout the State of Alabama.[16]

In August 1966 the Tuscaloosa County School Board formally assigned two Negro teachers to two predominantly white schools and four white teachers to two Negro schools. Shortly after school opened in Tuscaloosa County and these assignments became known, the State Superintendent of Education telephoned the Tuscaloosa County Superintendent of Education, Dr. W. W. Elliott, and recommended that the two Negro teachers who had been assigned to predominantly white schools be transferred to other schools. Dr. Meadows advised the local school official that he was calling as a constitutional officer of the State of Alabama and that the assignment of Negro teachers to white schools was "against the law" and "public policy" of the state. A few days later Governor George C. Wallace, in a press conference, announced that he would use the police power of the state to maintain peace and requested that the two Negro teachers be removed and reassigned forthwith. Later, still in September 1966, State Superintendent Meadows again endeavored to persuade the Tuscaloosa County Superintendent of Education to reassign the Negro teachers. About the same time, Attorney Hugh Maddox, Legal Advisor to the Governor, telephoned the Tuscaloosa County Superintendent and informed him that, "It [is] the public policy of the State that Negro teachers not teach white children" and that the Governor would use his police power to enforce the law. Dr. Elliott insisted that these Negro teachers were fully qualified and did not agree to reassign them. On October 17, 1966, the defendant Meadows, again by telephone, advised Dr. Elliott that the Governor suggested that two additional teacher units be allotted to the Tuscaloosa County school system provided the students being taught in white schools by the two Negro teachers were allowed the freedom to choose a white teacher. The State Board of Education also promised funds to the Tuscaloosa County school system for additional classrooms space to accommodate two additional white teachers. These state officials also made it clear that similar measures would be taken in other communities if Negro teachers were assigned to teach white students. A news release

16. " 'Segregation' is a perfectly good word. It has been practiced down through the ages for good results. The Lord set aside or segregated fruit from the apple tree in the Garden of Eden from Adam and Eve, but Eve persuaded Adam to taste the fruit and they were both banished from the Garden of Eden and honest men and women have had to work for their living ever since.

"Segregation has been used by people of the civilized world for man's greatest advancement. Matrimony, the most sacred of all bonds for men and women, is the highest type of segregation. In matrimony, husband and wife bind themselves to cleave to one another, even to the extent of forsaking all others if necessary. A great ministerial commandment has been the public pronouncement at the wedding ceremony 'What God has joined together let no man put asunder.' Without this bond of segregation, there would be no family unit. One of the Ten Commandments forbids breaking this human bond of segregation. Segregation is the basic principle of culture. The good join together to segregate themselves from the bad.

"Segregation is one of the principles of survival throughout the animal kingdom. Animals, in many instances, join their own kind to defend themselves by numbers against other animals that would destroy them without such segregated bond. Birds of a feather truly flock together. Wild geese fly across this continent in 'V' formation, but they never join any other flock of birds. Wild duck fly together and not with others birds. The wild eagle mates with another eagle and not with any other bird. Red birds mate with red birds, the beautiful blue birds mate with other blue birds, and so on through bird life.

"There can be segregation without immoral discrimination against anyone. Integration of all human life and integration of all animal life would destroy humanity and would detroy the animal kingdom. A time of reckoning must come in this United States of America on the fundamental principles of segregation and non-discrimination which can be achieved without destroying segregation in its true sense."

circulated by Dr. Meadows on October 25, 1966, to all city and county superintendents and to all news media was as follows:

In complete accord and with full approval of the Governor George C. Wallace, any county or city board of education will be allocated a teacher unit and apportionment of funds therefor where such board employs a teacher for pupils to transfer from a teacher of the opposite race to a teacher of their own race by freedom of choice of such pupils and their parents. Two such teacher units have already been allocated to a county board of education in which thousands of people filed a petition for such relief, both with the county board of education and the Governor of Alabama.

The foregoing findings serve to illustrate that the actions on the part of the defendant Alabama officials have been designed to perpetuate the racially segregated public school system in the State of Alabama. These actions have been to some extent, as noted, dramatic interference with local efforts to desegregate public schools. However, the most significant action by these defendant state officials, designed to maintain the dual public school system based upon race, is found in the day-to-day performance of their duties in the general supervision and operation of the system.

A. SCHOOL CONSTRUCTION AND CONSOLIDATION

The State Board of Education and its Secretary and Executive Officer have been vested by statute with general supervisory powers over public education in Alabama. Code of Alabama, Title 52. The State Board is specifically authorized to adopt rules and regulations "for the proper construction of school buildings." Title 52, Section 15, Code of Alabama. For approximately fifty years, the State Department of Education has conducted periodic surveys of the Alabama school system. These surveys are for the purpose of enabling that department to make decisions and recommendations concerning the location, construction, consolidation, expansion and abandonment of schools and school buildings. The factual information is obtained from field inspections and relates to the distribution of student population within the school districts, the location, capacity and physical condition of school buildings, and other information concerning school sites. This information is then evaluated by the State Superintendent and the State Board of Education. Certain standards regarding the adequacy of physical structures have been established by the State Department; for instance, standards respecting the minimum size of school sites, minimum student standards, and minimum teacher standards. On the basis of the information gathered in the surveys and these standards, the survey teams make recommendations and classifications. First, they classify the school buildings as either "suitable for permanent use," "suitable for temporary use," or "should be abandoned." Second, recommendations are made concerning the consolidation of existing schools. Third, recommendations are made concerning where new schools should be constructed or existing facilities enlarged. This information, together with the recommendations, is published by the State Department of Education in a Survey Report after the findings and recommendations are approved by the State Superintendent of Education. To a large extent, these recommendations—of necessity—are controlling upon the local school boards, since local boards that ignore them are penalized through the use of regulations that have been adopted by the State Board and through the use of other regulations such as those governing the allocations of state funds under the Minimum Program Fund [17] for teachers' salaries.

Other regulations establish a method of calculating the number of teacher units earned by and to be awarded each school. Transportation allowances to the local school districts are made in recognition of the survey recommendations, and the

17. Title 52, §§ 208–215, Code of Alabama.

Survey Reports determine, to a large extent, the State Superintendent's approval or disapproval of sites for new school construction or existing school expansion. In each instance, the local school board must obtain the approval of the State Superintendent as to the location and need for expansion; the approval of the State Superintendent is also needed for construction projects, since the principal source of construction funds comes from state bond issues. The State Superintendent's approval on school construction projects is important, even where local funds are used, since local boards of education cannot issue warrants without the specific approval of the State Superintendent of Education. Title 52, Code of Alabama, §§ 216–218, 235(4). Furthermore, the Governor and the State Superintendent of Education constitute a majority of the Public School and College Authority. This agency has the power to establish priorities for projects and to make funds more readily available to local school systems.

■ The evidence in this case is absolutely overwhelming that the State Board of Education and the Alabama Superintendent of Education, with the assistance of their staff in the State Department of Education, have exercised extensive control over school construction and consolidation in such a manner as to perpetuate a dual public school system based upon race and to interfere with the orderly desegregation of the public schools in the State of Alabama. This discriminatory course of conduct on the part of these defendants has continued and persisted since this Court's order of July 1964; for instance, the interference of State Superintendent Meadows and the Governor with the Tuscaloosa County Board of Education and their offer to that local board regarding construction funds. Such an offer could have been for no purpose other than to thwart the efforts of that local board to desegregate the faculties of its schools. Furthermore, the use of that authority and control on the part of these defendants over school construction has not been confined to manipulating the availability of funds. For instance, a more insidious method of control over local boards for the purpose of perpetuating a dual public school system based upon race has been with respect to school construction and consolidation. This is found in the judgments and recommendations contained in the school surveys. The survey recommendations regarding consolidation strictly observe the racially segregated character of the schools. In Calhoun County—to take but one example—rather than recommend that the local board close down an inferior Negro school (Hawkins) and consolidate it with a nearby white school (Bynum), the survey recommended, instead, that the Negro students from the Hawkins School be transported across the county to Calhoun County Training School, a Negro school. Not only was the Calhoun County Training School a greater distance from Hawkins, which necessitated busing for the purpose of maintaining segregation, but, compared to Bynum, the physical facilities were significantly inferior and less room was available for the Negro students who were bused from Hawkins. The Survey Report that was then in existence reflected that the Calhoun County Training School to which the Hawkins Negro students were transported "is located on an inadequate site about which little can be done." Such a method of consolidation was for no purpose other than to perpetuate segregation of the races in that public school system.

The survey teams have also sought to perpetuate the dual public school system by refusing to recommend consolidation where consolidation would have had the effect of desegregating. These reports reflect that the survey teams consistently compromised the minimum student standards in order to maintain segregation of the students. Such a course of conduct is condemning evidence that the defendants have sought to perpetuate and, through this means, have effectively perpetuated the dual public school system.

In yet another area, the state survey recommendations pertaining to the location of new schools have been designed to perpetuate the dual system. Considerations of economy, convenience, and education have been subordinated to the policy of racial separation; survey approvals of construction sites reflect this policy. A striking instance of this discriminatory conduct is found in the Clarke County survey conducted during the 1964–65 school year. At the time of the survey, there were twenty-three schools in the system attended by approximately 5800 students—2400 white and 3400 Negro. Consolidation was clearly called for; yet the survey staff sought to perpetuate the segregated system by recommending and approving that, in each of the three principal towns of the county, two separate schools be maintained as permanent school installations, each covering grades 1–12. This recommendation in each of these three towns in Clarke County, Alabama, can be explained only in racial terms. Other similar numerous examples have been presented, the discussion of which would serve no useful purpose.

Furthermore, through the control of finances in school construction, these defendants have insured that Negro children are provided with markedly inferior educational opportunities. For example, the average pupil-teacher ratio in the Negro schools is higher than in the white schools; the per-pupil valuation of school buildings and contents is $607.12 per white pupil as compared to $295.40 per Negro pupil. Over 25% of the Negro high schools in Alabama are unaccredited as compared with only 3.4% of white high schools.

## B. FACULTY AND STAFF

█ It is no longer open to question that faculty and staff desegregation is an integral part of any public school desegregation plan—not because of teachers' employment rights, but because students are entitled to a nonracial education, and assignment of teachers to students on the basis of race denies students

that right. See Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965); Singleton v. Jackson Municipal Separate School District, 355 F.2d 865 (5th Cir. 1966); Wheeler v. Durham City Board of Education, 363 F.2d 738 (4th Cir. 1966); Davis v. Board of School Commissioners of Mobile County, 364 F.2d 896 (5th Cir. 1966).

The constitutional duty to desegregate the faculties in public school systems was made clear by the Supreme Court of the United States in Rogers v. Paul, supra:

Two theories would give students not yet in desegregated grades sufficient interest to challenge racial allocation of faculty: (1) that racial allocation of faculty denies them equality of educational opportunity without regard to segregation of pupils; and (2) that it renders inadequate an otherwise constitutional pupil desegregation plan soon to be applied to their grades.

This constitutional duty was recognized by the United States Court of Appeals for the Fifth Circuit in Singleton v. Jackson Municipal Separate School District, supra, when the Court stated:

* * * [W]e regard it as essential that the plan provide an adequate start toward elimination of race as a basis for the employment and allocation of teachers, administrators, and other personnel.

and again in Davis v. Board of School Commissioners of Mobile County, supra, when the Court stated:

* * * [T]he plan must be modified in order that there be an end to the present policy of hiring and assigning teachers according to race by the time the last of the schools are fully desegregated for the school year 1967–68.

The recent decision in Clark v. Board of Education of the Little Rock School District, 369 F.2d 661, 669 (8th Cir., December 15, 1966), requires that spe-

cific steps must be taken now to end faculty segregation. The Court stated:

> We agree that faculty segregation encourages pupil segregation and is detrimental to achieving a constitutionally required non-racially operated school system. It is clear that the Board may not continue to operate a segregated teaching staff. * * * At this point the Board is going to have to take accelerated and positive action to end discriminatory practices in staff assignment and recruitment.

and, in another passage:

> [T]he Board should make all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future. The age old distinction of "white schools" and "Negro schools" must be erased. The continuation of such distinctions only perpetuates inequality of educational opportunity and places in jeopardy the effective future operation of the entire "freedom of choice" type plan.

■ As in other areas, some of which have already been discussed, defendants have endeavored to thwart and, with considerable success, have thwarted efforts toward implementation of the constitutional requirement to eliminate faculty and staff segregation in the public school system of Alabama. The Governor's legal adviser was indeed correct when he declared that, "It [is] * * * the public policy of the State that Negro teachers not teach white children." Evidence in this case reflects that this policy has been successful for, of over 28,000 teachers in the state, only 76 are teaching in schools to which students of the opposite race have been traditionally as-

signed. Defendants, through the use of pressures, some of which have herein been outlined, have required local boards to conform to their views on faculty and staff segregation in the school system. As a matter of fact, they have acted affirmatively to use the Minimum Program Fund to make segregation of the faculties and staffs in the several school districts attractive. For instance, as we have previously noted, the State Superintendent of Education, at the insistence of the Governor, utilized the state's power, that had been vested in these defendants, of allocation of teacher units by authorizing two additional units to be used for the purpose of hiring white replacements for the two Negro teachers hired by the Tuscaloosa County Board of Education to teach in white schools.

Teacher institutes continue to be conducted separately for each race. Section 339, Title 52, Code of Alabama. Generally, the control exercised by these defendants over in-service training programs and teacher certification has been used not as a means to eliminate discrimination in the dual school system of Alabama but as an instrument to enforce segregation throughout that system.

■ In this area, as in other areas herein discussed, there is an affirmative duty on the part of these defendants, as well as on the part of other school officials throughout the state, to desegregate staffs and faculties. This is also a constitutional duty apart from any federal regulatory scheme.

## C. TRANSPORTATION

■ It cannot seriously be contended that transportation is not a critical factor in the process of disestablishing the traditional dual public school system.[18]

---

18. See, e. g., Franklin v. Barbour County Board of Education, 259 F.Supp. 545 (MD Ala.1966); Harris v. Crenshaw County Board of Education, 259 F.Supp. 167 (MD Ala.1966); Carr v. Montgomery County Board of Education, 253 F.Supp. 306 (MD Ala.1966); Harris v. Bullock County Board of Education, 253 F.Supp. 276 (MD Ala.1966); United States v.

Lowndes County Board of Education, Civ. Action No. 2328–N, MD Ala., February 10, 1966; Wright v. County School Board of Greenville County, 252 F.Supp. 378 (ED Va.1966); United States v. North Pike Consolidated School District, Civ. Action No. 3807, SD Miss. Sept. 25, 1965; Baird v. Benton County Board of Education, Civ. Action No. W.C. 6513,

■ The defendant state officials exercise considerable authority in this area since nearly 100% of the cost of local school transportation programs is paid from the state Minimum Program Fund and, further, since § 209, Title 52, Code of Alabama, empowers the State Board of Education to approve transportation routes submitted by the local boards and to establish minimum standards for the buses that are used to transport the students. This Court's finding in its July 1964 order that these defendants have used this control over transportation to perpetuate segregation is as true now as it was then. The State Board continues to finance and permit the operation of school bus systems organized on a racially discriminatory basis. The buses provided Negro children have been and continue to be of a markedly inferior quality. There is duplication and overlapping of bus routes in the school bus transportation provided in practically every area of the state to permit white children to avoid attending desegregated schools closer to their homes; further, this system has been and is being used to transport Negro children living near white schools to Negro schools miles away.

### D. TRADE SCHOOLS, VOCATIONAL SCHOOLS AND STATE COLLEGES

The state's trade schools, vocational schools and state colleges [19] continue to be operated on a segregated basis. The operation of these systems is the immediate responsibility of the State Board of Education. See the Regional Vocational and Trade School Act of 1947, Code of Alabama, Title 52, § 451(4); the Alabama Trade School and Junior College Authority Act of 1963, Code of Alabama, Title 52, § 509(96); Code of Alabama, Title

52, §§ 451(3) and 509(85). See also Code of Alabama, Title 52, §§ 438 and 452.

■ There is no necessity for setting out the facts in detail concerning the operation of these state colleges since the evidence conclusively establishes—the defendants do not controvert it—that these schools have been and continue to be operated as if Brown v. Board of Education were inapplicable in these areas. For example, § 438, Title 52, Code of Alabama, reads:

> The state board of education shall have the control and management of the several teachers' colleges of the state, for white teachers, located at Florence, Jacksonville, Livingston, Troy, and of the Alabama State College for Negroes located at Montgomery.

The plaintiffs are also clearly entitled to relief in this area.

■ It is quite clear that the defendants have abrogated, and openly continue to abrogate, their affirmative duty to effectuate the principles of Brown v. Board of Education, supra. Although the facts as herein outlined speak eloquently for themselves, there is no more clear an indication of this than Superintendent Meadows' statement that he has done nothing to eliminate segregation in the public schools of Alabama. As Judges Soboloff and Bell stated in a concurring opinion in Bradley v. School Board of the City of Richmond, Virginia, 345 F.2d 310, 322, 323 (4th Cir. 1965):

> [T]he initiative in achieving desegregation of the public schools must come from the school authorities.
>
> \* \* \* \* \* \*
>
> Affirmative action means more than telling those who have long been deprived of freedom of educational op-

---

ND Miss. Aug. 3, 1965; United States v. Natchez Special Municipal Separate School District, SD Miss., January 28, 1966 as amended April 15, 1966, 267 F. Supp. 595; Killingsworth v. Quitman Consolidated School District, Civ. Action No. 1302(E), SD Miss., August 14, 1965.

19. The term "state college," as used herein, includes all state colleges or universities except the University of Alabama, Auburn University, University of South Alabama at Mobile, and Alabama College at Montevallo, which institutions have separate boards of trustees and are not administered by the Alabama State Board of Education.

*portunity, "You now have a choice."* [Emphasis added.]

\* \* \* \* \* \*

It is now 1965 and high time for the court to insist that good faith compliance requires administrators of schools to proceed actively with *their* nontransferable duty to undo the segregation which both by action and inaction has been persistently perpetuated.

Accord, Cooper v. Aaron, supra. Such a course of conduct on the part of these defendants has served to thwart and, in many instances, defeat voluntary desegregation plans that have been attempted by the local school districts.

It should be noted that one of the most illegal methods adopted by these defendants to impede desegregation on a local level is that they have consistently attempted to obscure the fact that local school authorities have a federal constitutional duty to desegregate their school systems totally, notwithstanding whether a particular system is under a court order or whether that school system agrees to comply with the requirements of the Department of Health, Education and Welfare of the United States.

▇▇▇ Statements to the effect that "the local school districts should go no further than ordered by the Court," and the offers to replace federal funds with state funds have been designed to lead the local school authorities to believe that they have no such affirmative duty. Such philosophy completely ignores the fact that the paramount duty to desegregate is a constitutional one independent of any court order and independent of any federal regulatory program. It is entirely disingenuous of the defendants to fail to admit that their activities were coercive and for them to contend they were, at most, acting in an advisory capacity, with the ultimate control residing with the local boards. The record presented to this Court clearly indicates that these defendants stand ready to exercise, and have in many instances in areas of public education in Alabama exercised, the same powers and control that they demonstrated two and one-half years ago over the Macon County schools when the desegregated school was closed and white students were bused to other schools in the same system that continued to operate on a segregated basis. In addition, this Court's conclusion in its July 1964 order that "The control by the State Board of Education over the local school systems is effected and rigidly maintained through control of \* \* \* finances" has not been diminished by subsequent events. On the contrary, the evidence concerning the conduct of these defendants since 1964 strengthens that conclusion. This control on the part of these defendants over the local boards is all pervasive; it invests in these defendants power over school construction and consolidation, teachers, school transportation and other vital areas in the operation of the public schools throughout the state.

## IV. THE TUITION GRANT STATUTE

▇▇▇ As observed earlier in this opinion, state and local authorities are under an affirmative constitutional duty to provide equal educational opportunities for all children by ceasing to discriminate on the basis of race and to the extent herein noted and ordered, eliminating the effects of past discrimination. To obviate the performance of this duty, a state may neither operate and maintain two school systems—one integrated, one segregated—giving public school students a choice between the two,[20] nor simply go out of the business of running schools in some school districts and allow that function to be undertaken by private persons.[21] It is also axiomatic that a

**20.** Boson v. Rippy, 285 F.2d 43, 45–46 (5th Cir. 1960); Kelly v. Board of Education of City of Nashville, 159 F.Supp. 272, 278 (MD Tenn. 1958).

**21.** Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Lee et al. v. Macon County Board of Education, 231 F.Supp. 743 (MD Ala.1964).

state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.[22]

Measured against these criteria and when viewed in the context of the facts and circumstances which gave rise to its enactment, the vice of the present tuition statute [23] becomes clear: it is but another attempt of the State of Alabama to circumvent the principles of *Brown* by helping to promote and finance a private school system for white students not wishing to attend public schools also attended by Negroes.

Alabama's present tuition statute must be analyzed in the historical context which gave rise to its enactment. It is unmistakably clear that the concept of tuition grants to students wishing to attend private schools in Alabama was born of an effort to resist and frustrate implementation of the *Brown* decision. Lee v. Macon County Board of Education, 231 F.Supp. 743 (MD Ala. 1964).[24] The first such statute, enacted in 1957, authorized tuition grants for students attending private nondenominational schools in school districts where no public school was available. Chapter 4B of Title 52, Code of Alabama, of which the 1957 tuition grant statute was a section, authorized each local board of education to discontinue operating its public school when it found that the continued operation of its public school "will be accompanied by such tensions, friction, or potential disorder or ill will within the school as substantially to impair effective standards or objectives of

22. See Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964). And see, Lombard v. State of Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); NAACP v. State of Alabama, ex rel. Patterson, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Burton v. Wilmington Parking Authority, 365 U.S. 715, 726–727, 81 S.Ct. 856, 6 L.Ed. 2d 45 (1961) (Justice Stewart concurring); Evans v. Newton, 382 U.S. 296, 305–307, 86 S.Ct. 486, 15 L.Ed.2d 373 (1965) (Justice White concurring); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 658 (ED La.1961), aff'd per curiam 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962).

23. "Any other provisions of law notwithstanding, no child shall be compelled to attend any school when in the judgment of the parent or guardian of such child attendance in the school to which assigned will be detrimental to the physical or emotional health of such child or subject the child to hazards to personal safety. In any such case, the parent or guardian of such child shall file written objections with the local board of education and request transfer and reassignment. Upon refusal of any board to grant such a request, the child shall proceed as provided in section 61(7) of this title, or in lieu thereof, submit an application to the state board of education for a tuition grant to attend any private nonsectarian school in or outside the school attendance district in which the child resides. Tuition grants approved by the state board shall not exceed a total of one hundred eighty-five dollars ($185.00) in any one school year, or a sum to be determined by the state superintendent of education to be the cost per pupil in average daily attendance in the public schools of the state, whichever sum shall be less. The state board of education shall promulgate rules and regulations for the administration of tuition grants which shall be paid only from funds appropriated by the legislature for such purpose. It shall be unlawful for any person to use funds granted under this chapter for any purpose other than for the payment of tuition in school; * * *." Title 52, § 61(8), Code of Alabama.

24. It is appropriate to reiterate our conclusions on this point made in our July 13, 1964 order: "Alabama's grant-in-aid system appears to have been first proposed by the Special Interim Committee of the Alabama Legislature in 1954. The legislative history of the statute subsequently enacted by the Alabama Legislature reflects that this Committee was formed to consider means of meeting the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Committee's report to the Legislature set forth a number of proposals for delaying or avoiding racial desegregation in education, and it proposed a number of specific amendments to the Alabama Constitution, all of which were ultimately adopted. These grant-in-aid laws are all set out in Title 52, Code of Alabama, recompiled 1958." 231 F.Supp. at 743, n. 4.

education of its pupils, or by potential impairment of peace, order and good will in the community, school district, or county involved." Acts of Alabama 1957, No. 528, § 1 at 723. It was pursuant to this chapter that the State Board of Education ordered all grades above the seventh grade in the Macon County public schools closed and directed that payment of tuition grants be made to students residing in Macon County where no public schools were available, who attended racially segregated private schools. In our July 13, 1964 order, we found that implementation of the tuition grant statute was unconstitutional and enjoined its further use.

It is clear that the present tuition statute was born of the same effort to discriminate against Negroes, and was designed to fill the vacuum left by this Court's injunction against the 1957 tuition statute. Although the statute is cast in terms of making eligibility for a tuition grant turn on the parent's judgment that the child's attendance at public school will be detrimental to the child's "physical and emotional health," when read in perspective it turns eligibility for tuition on the parent's dissatisfaction with sending his child to a desegregated public school. Prior to 1965–66, § 61(8) said as much on its face. It authorized the parent or guardian of any child attending "any school in which the races are commingled" to terminate the child's attendance there. The amendment simply substituted for the objective test—commingling of races—the subjective test that now appears in the statute—"judgment" of the parent or guardian. Significantly, every dollar paid during the 1965–66 school year went to students enrolled in all-white private schools established when the public schools desegregated.

Finally, it is also important to emphasize that the state has failed to advance any rational basis on which to explain the statute. Eligibility for a tuition grant does not turn on the inadequacy of public educational facilities to accommodate all school-age children in the school district. The statute does not manifest state concern for equalizing the opportunity of all children, including the poor, to attend private schools, for the statute does not require a showing of financial need. Nor does the statute exhibit state concern for improving the educational opportunities of special classes of students—those who may be gifted or those who may be handicapped. Although the statute applies only to public school pupils, it may not be invoked by pupils in public schools who wish to attend private schools for reasons such as superior instruction, smaller classes, and so forth. The statute narrows its focus on an extremely limited class of students —those students whose physical or emotional health would be adversely affected or whose safety might be jeopardized by attending public schools. Since neither of these conditions can be demonstrated to have any rational basis in fact, there can be only one way to explain the statute: it is designed to aid and assist private discrimination of the kind which would be condemned if attempted directly by the state. As such, the statute is unconstitutional.

It is appropriate to observe in concluding this aspect of the case that it is now becoming apparent that the State of Alabama is attempting to make a concerted effort to establish and support a separate and private school system for white students. Twice in less than three years this Court has had to strike down tuition grant provisions designed to achieve this end. Moreover, the Governor has officially encouraged private contributions to support the many private schools throughout the state as *alternatives to the public desegregated school system.*[25]

---

25. "[Y]our * * * *donations* * * * *will help people in our State who are being forced to conduct private schools because of the destruction of their public schools.*

"This group, made up of representatives of the various private schools, will see that your contribution is distributed to these schools on an equitable basis. These people—these parents—are fight-

Up to this point, this Court has used its injunctive powers to prevent the State of Alabama from establishing a separate school system for white children. It must be made perfectly clear, however, that if the state persists in its efforts dedicated to this end, and its involvement with the private school system continues to be "significant," [26] then this "private" system will have become a state actor within the meaning of the Fourteenth Amendment and will need to be brought under this Court's state-wide desegregation order.

## V. THE RELIEF

### A. GENERAL NATURE

As has been outlined in some detail, the defendant state officials have engaged in a wide range of activities to maintain segregated public education throughout the State of Alabama. These activities have been concerned with and have controlled virtually every aspect of public education in the state, including site selection, construction, consolidation, assignment of teachers, allocation of funds, transportation, vocational education, and the assignment of students.

 The remedy to which these plaintiffs are constitutionally entitled must be designed to reach the limits of the defendants' activities in these several areas and must be designed to require the defendants to do what they have been unwilling to do on their own—to discharge their constitutional obligation to disestablish in each of the local county and city school systems in Alabama that are not already operating under a United States court order, the dual public school system to the extent that it is based upon race or color. In this connection, the State of Alabama and particularly the defendant state officials are under an affirmative constitutional duty to take whatever corrective action is necessary to

disestablish such a system. Faculty members and staff members, facilities and activities, as well as student bodies, must be desegregated to such an extent that there no longer exists in the Alabama public school system discrimination of any sort or to any degree that is based upon race or color.

This Court can conceive of no other effective way to give the plaintiffs the relief to which they are entitled under the evidence in this case than to enter a uniform state-wide plan for school desegregation, made applicable to each local county and city system not already under court order to desegregate, and to require these defendants to implement it. Only in this way can uniform, expeditious and substantial progress be attained, and only in this way can the defendant state officials discharge the constitutional duty that was placed upon them twelve years ago in Brown v. Board of Education, supra. It cannot seriously be contended that the defendants do not have the authority and control necessary to accomplish this result. Certainly the possibility of losing state funds for failure to abide by and implement the minimum constitutional requirements for school desegregation which this opinion and the accompanying decree require will, without any doubt, effect compliance. Indeed, it is quite clear from the evidence in this case that the local school officials will, through economic necessity if for no other reason, abide by the orders and regulations of these state officials and, in most instances, will be relieved to find themselves no longer under the pressures and exhortations of these defendants to abrogate their clear constitutional duties in this area. The local officials should, after the entry of this opinion and the accompanying decree, be able to return to the teaching of students and dealing with the related educational prob-

---

ing for their freedom too—a freedom that affects all of us and I hope that you will join me in helping those whose schools have been taken away from them." (Emphasis added.)

26. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961). See cases in footnote 22, supra. And see Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963).

lems rather than expending their time and energies trying to tread the difficult "middle ground" between conflicting federal and state demands.

▉ The argument that this Court is proceeding without jurisdiction over indispensable parties to this litigation, to-wit, local school boards throughout the state, is not persuasive. We are dealing here with state officials, and all we require at this time is that those officials affirmatively exercise their control and authority to implement a plan on a statewide basis designed to insure a reasonable attainment of equal educational opportunities for all children in the state regardless of their race. It may be that in some instances a particular school district will need to be brought directly into the litigation to insure that the defendant state officials have implemented this Court's decree and that the state is not supporting, financially or otherwise, a local system that is being operated on an unconstitutional basis. Hopefully, these instances will be the exception and not the rule. Clearly this possibility does not diminish the propriety of the state-wide relief to be ordered. Having already resolved this issue of state-wide relief against the defendants in the order made and entered in Lee, et al. (United States of America, Amicus Curiae) v. Macon County Board of Education, July 13, 1964, 231 F.Supp. 743, further discussion and analysis is not necessary.

## B. OTHER CONSIDERATIONS

▉ Invariably in this area of our country the "freedom of choice" plan has been chosen by the courts and the school systems themselves as the method to effectuate the requirements of the Fourteenth Amendment in the field of desegregation of public educational facilities. This is the plan which this Court will require—for the time being—these defendant officials to implement throughout the State of Alabama.[27] This Court recognizes that in the freedom of choice plan there are many administrative complexities. It may be that these administrative problems will make some other method advisable in the future. It may well be that the freedom of choice method of desegregation will not fully and completely disestablish the dual public school system based upon race.[28] However, for the time being, provided that all of the factors designed to influence and having the effect of influencing choice be eliminated, the freedom of choice plan will be put into effect upon a state-wide basis. It should be emphasized that, if choice influencing factors are not eliminated, freedom of choice is a fantasy. A "freedom of choice" plan ordered by a court or adopted by school authorities is not an end in itself; it is but a means to an end. The plan must operate in such a manner as to meet the constitutional mandate of the Fourteenth Amendment. As was stated in the concurring opinion in Bradley v. School Board of City of Richmond, 4 Cir., 345 F.2d 310, 323:

> Affirmative action means more than telling those who have long been deprived of freedom of educational opportunity, "You now have a choice." In many instances the choice will not be meaningful unless the administrators are willing to bestow extra effort and expense to bring the deprived pupils up to the level where they can avail themselves of the choice in fact as well as in theory. * * * The district judge must determine whether the means exist for the exercise of a

27. The reasons are obvious why school officials have not chosen other plans such as the "neighborhood school" plan, for under such a plan white students would be immediately required to attend Negro schools located in their neighborhoods.

28. The United States Supreme Court has not yet ruled on the freedom of choice

method of ending racial segregation in the field of public education. However, Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), has been cited as support for such a plan. See Bradley v. School Board of City of Richmond, 345 F.2d 310, 318 (4th Cir. 1965).

choice that is truly free and not merely pro forma.

In short, the measure of a freedom of choice plan—or, for that matter, any school plan designed to eliminate discrimination based upon race—is whether it is effective. If the plan does not work, then this Court, as well as the State of Alabama school officials—both state and local—is under a constitutional obligation to find some other method to insure that the dual school system of public education based upon race is eliminated. In adopting this plan, therefore, we stress again that it may be only an interim plan. Its success will be periodically judged in the light of the criteria herein set out. For this and all other purposes, jurisdiction will be retained.

The decree and injunction heretofore issued in this case will be enlarged as herein indicated and a formal decree will be entered accordingly.

## DECREE

It is ORDERED, ADJUDGED and DECREED that the Alabama State Board of Education, Mrs. Lurleen Burns Wallace, Governor of the State of Alabama and President of the Alabama State Board of Education, James D. Nettles, Ed Dannelly, Mrs. Carl Strang, Fred L. Merrell, W. M. Beck, Victor P. Poole, W. C. Davis, Cecil Word, and Rev. Harold C. Martin, members of the Alabama State Board of Education, and Ernest Stone, Executive Officer and Secretary of the Alabama State Board of Education, and Alabama State Superintendent of Education, together with their agents, servants, employees, successors in office, and all those in active concert or participation with them who receive actual notice of this decree or any of them, shall be and hereby are permanently enjoined from discriminating on the basis of race in the operation or the conduct of the public schools of Alabama or in any manner pertaining to the public schools of Alabama. As set out more particularly in the body of this decree, said defendants shall take affirmative action to disestablish all state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or encouraged racial discrimination in their activities and their operation of the public school systems throughout the State.

It is further ORDERED, ADJUDGED and DECREED that:

### I

*School Construction and Consolidation*

A. The State Superintendent of Education shall require all local school systems that have been the subject of a survey conducted by or under the auspices of the State Department of Education to submit to him, prior to the commencement of the 1967–68 school year, all plans that have been formulated or adopted for the consolidation of any schools in their systems that had at the time of the survey, or now have, fewer students than required under the minimum-student standards of the State Department of Education.

B. The State Superintendent of Education shall continue to conduct surveys of the local school systems throughout the State, and require that those conducting the surveys shall:

1. Continue to collect and report data regarding the residence of students and the attendance at schools by race;

2. Not fail to recommend consolidation because desegregation would result;

3. Recommend, to the extent consistent with the *proper operation of* the school system as a whole, that consolidation shall be achieved in a manner to effect desegregation of the schools of the system;

4. Recommend, to the extent consistent with the proper operation of the school system as a whole, that the location, grades and capacity of new schools and expansions of existing school plants be such as to effect desegregation of the schools of the system.

C. Approval by the State Superintendent of Education of all sites upon

which schools are to be constructed or existing facilities expanded shall not be based on any survey conducted prior to the entry of this decree, or any survey that does not accord with the standards set forth above in paragraph B.

D. Approval by the State Superintendent of Education of all sites upon which schools are to be constructed or existing facilities expanded shall be withheld if, judged in light of the capacity of existing facilities, the residence of the students, and the alternative sites available, the construction will not, to the extent consistent with the proper operation of the school system as a whole, further the disestablishment of state enforced or encouraged public school segregation and eliminate the effects of past state enforced or encouraged racial discrimination in the State's public school system.

## II

### Teachers

A. The State Superintendent of Education shall develop a detailed program for assisting and encouraging faculty desegregation in the local school systems throughout the State for implementation prior to the 1967–68 school year and shall submit this program to the Court and all parties within 60 days after the entry of this Court's decree. The program should, at a minimum, establish ways in which the State Department of Education will assist local systems in recruiting, and in planning for the placing of new teachers and reassigning of old teachers on a desegregated basis so that by the fall of 1967, insofar as it is administratively feasible, no school located in a school district where students of both races are in attendance listed in Section IV of this decree will have teachers of only one race. The program should also provide for assistance in providing training which may be necessary to upgrade the qualifications of some teachers in order to facilitate desegregation of faculty. The program should provide for further progress after 1967–68 to help said local school systems stay in compliance with constitutional require-

ments in the area of public school desegregation.

B. Any services made available by the State Superintendent of Education to assist local school boards to locate and employ suitable teachers, or to assist teachers to find suitable positions, shall be provided in a manner to effect faculty desegregation in the public schools throughout the State.

C. The State Superintendent of Education shall not give force or effect to that provision of Section 339 of Title 52 of the Alabama Code which requires that separate teacher institutes be held for Negro and white teachers; and he shall direct that a single, system-wide teacher institute be held in each local school system for the 1967–68 school year, and for each school year thereafter, and that such institutes be conducted in a nondiscriminatory manner.

D. The State Superintendent of Education shall conduct all in-service training programs on a desegregated basis.

E. The State Superintendent of Education shall apply certification requirements without discrimination on the basis of race, and shall not apply certification requirements, or grant provisional certificates, in a manner to perpetuate faculty segregation or to avoid faculty desegregation.

F. The State Superintendent of Education shall inform all applicants for certification that the school systems throughout the State are obliged to desegregate their faculties, and that teachers are subject to assignment in accordance with that obligation.

### III

### School Transportation

A. The defendant state officials shall require all local school boards listed in Section IV of this decree, prior to the commencement of the 1967–68 school year, to eliminate race as a basis for assigning students to school buses and to eliminate overlapping and duplicative bus routes based on race.

B. The defendant state officials shall require all of said local school boards, prior to the commencement of the 1967–68 school year, to establish nondiscriminatory criteria governing the availability of bus transportation to students within the school district. These criteria at a minimum, should entitle each student to be transported to the school he attends if that school is the one nearest his residence and if that school is at least two miles from his residence.

C. The State Superintendent of Education shall require all local school boards listed in Section IV of this decree to submit to him for approval within 60 days after the entry of this decree their proposed bus routes and criteria governing the eligibility for bus transportation. The State Superintendent shall approve or disapprove the proposed routes and criteria, within 30 days of receiving them, according to the standards set forth in the preceding paragraphs A and B of this section, and, to the extent that he disapproves them, he shall notify the local systems of their deficiencies.

D. The State Superintendent of Education shall require all of said local school boards to communicate those routes and criteria he has approved to students and parents of the school districts in a readily understandable manner and substantially before the opening of the 1967–68 school year. The local school authorities shall notify parents and children, prior to the choice period, that the bus routes and criteria governing the eligibility for bus transportation are being revised and will be established on a nondiscriminatory basis.

E. Whatever technical assistance is made available by the State Superintendent for assisting said local school boards in meeting school transportation problems shall be provided in a manner to assist the local school boards to eliminate overlapping and duplicative bus routes based on race and to formulate nondiscriminatory criteria regarding eligibility of students for transportation.

IV

*Desegregation Plans for Local School Systems*

The State Superintendent of Education shall notify the following school systems that they are required to adopt a desegregation plan for all grades commencing with the 1967–68 school year that meets the standards embodied in the plan attached to this decree and designated as Exhibit "A":

Alexander City

Andalusia

Anniston

Athens

Attalla

Auburn

Autauga County

Baldwin County

Bibb County

Blount County

Brewton

Butler County

Calhoun County

Carbon Hill

Jackson County

Jacksonville

Jasper

Lamar County

Lanett

Lauderdale County

Lee County

Limestone County

Linden

Marengo County

Marion

Marion County

Marshall County

Monroe County

Morgan County

Chambers County

Cherokee County

Chilton County

Clarke County

Clay County

Cleburne County

Coffee County

Colbert County

Conecuh County

Coosa County

Covington County

Cullman

Cullman County

Dale County

Daleville

Dallas County

Decatur

DeKalb County

Demopolis

Dothan

Elba

Elmore County

Enterprise

Escambia County

Etowah County

Eufaula

Fayette County

Florala

Florence

Fort Payne

Franklin County

Geneva County

Greene County

Henry County

Houston County

Mountain Brook

Muscle Shoals

Oneonta

Opelika

Opp

Ozark

Phenix City

Pickens County

Piedmont

Pike County

Randolph County

Roanoke

Russell County

Russellville

St. Clair County

Scottsboro

Selma

Sheffield

Shelby County

Sumter County

Sylacauga

Talladega

Talladega County

Tallapoosa County

Tallassee

Tarrant

Thomasville

Troy

Tuscaloosa

Tuscaloosa County

Tuscumbia

Walker County

Washington County

Winfield

Winston County

———◆———

The State Superintendent of Education shall inform these local school systems that the desegregation plan is to be adopted within 20 days from the entry of this decree; and within 25 days from the entry of this decree the State Super-

intendent shall submit a report to this Court and to all parties informing them of the action taken by him to discharge this obligation and the results of that action.

## V

### Institutions Under State Board of Education Control

No person shall be denied admission to any trade school, junior college, or state college [1] administered by the Alabama State Board of Education upon the ground of race, nor shall he be subjected to racial discrimination in connection with his application for enrollment in or his attendance at any such trade school, junior college, or state college. Dual attendance zones based on race for such trade schools, junior colleges, and state colleges shall be abolished. The State Department of Education shall direct such trade schools, junior colleges, and state colleges to recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each such trade school, junior college, and state college by September 1967.

## VI

### Equalization of Facilities

The State Superintendent of Education shall develop, and submit to this Court and all the parties within 120 days after the entry of this decree, a detailed program for bringing the quality of the physical facilities, equipment, services, courses of instruction, and instructional materials of schools previously maintained for Negro students up to the level in schools previously maintained for white students. This program shall eliminate those disparities reflected in different pupil-teacher ratios, survey classifications of buildings and sites, per pupil

expenditures, valuation of school property, library books per pupil, course offerings, accreditation, and transportation. In connection with applications for teacher units for vocational teachers or teachers of exceptional children, the State Superintendent of Education shall consider and grant those applications that satisfy educational requirements and had been submitted before the entry of this decree on behalf of schools traditionally maintained for Negro students, prior to acting upon other applications for such units.

## VII

### Information and Reports

A. The State Superintendent of Education shall make, at reasonable times and places, and upon reasonable notice, the following available to all parties:

1. All consolidation plans submitted to him by local school boards pursuant to the requirements of paragraph A of Section I of this decree.

2. All survey reports hereafter conducted pursuant to paragraph B of Section I of this decree.

3. All applications and records of action by the State Superintendent of Education regarding the approval or disapproval of school construction or expansion, together with all information relating to the sites, including the pertinent survey reports.

4. All documents relating to teacher institutes and to in-service training programs, including a report giving the number of teachers that attended each institute, the schools the teachers were from, and the race of the teachers.

5. All proposals of the local school boards relating to the routing of school buses and the criteria governing eligibility for bus transportation

[1]. The term "state college," as used herein, includes all state colleges or universities except the University of Alabama, Auburn University, University of South Alabama at Mobile, and Alabama College

at Montevallo, which institutions have separate boards of trustees and are not administered by the Alabama State Board of Education.

that are submitted to the State Superintendent for his approval under paragraph C of Section III of this decree, together with a report indicating which proposals have been approved and when and how students and parents in the various school systems throughout the State were informed of these routes and criteria.

6. All records pertaining to action taken by the State Superintendent of Education with respect to applications for teacher units for teachers of exceptional children and vocational education teachers.

7. Records indicating the State Superintendent's action with respect to provisional teaching certificates, and a report indicating how applicants for certification were informed of the obligation of the local systems regarding faculty desegregation.

8. Records showing the attendance zones, bus routes, racial composition of faculty, and racial composition of student body for each trade school, junior college, and state college.

B. The State Superintendent of Education shall submit to the Clerk of this Court and serve upon all parties:

1. Within 60 days after the entry of this decree the detailed program regarding faculty desegregation required by paragraph A of Section II of this decree.

2. Within 120 days after the entry of this decree the detailed program regarding school equalization required by Section VI of this decree.

3. Within 25 days after entry of this decree, a report on the action taken by the State Superintendent of Education respecting the 99 school districts listed in Section IV of this decree, and the results of that action.

4. A report, which must be submitted by October 5 each year, setting forth the following information with respect to the local school systems listed in Section IV of this decree:

(a) The number of students by race, in each grade of each school for the current school year;

(b) The number of faculty members of each race assigned to each school for the current school year, together with the number of faculty vacancies or new positions, by school, that have arisen or have been filled by the school board since the last report; and

(c) The number of students that have requested to transfer from the schools they were assigned to, together with a description of the action taken by the local school board on such requests and the reasons therefor.

5. A report, which must be submitted on or before June 15 of each year, setting forth the following information with respect to each school system listed in Section IV of this decree:

The number of choice applications received for each grade, the number of choices granted and denied, and the reasons for all denials.

IX

*Interference*

The defendant state officials shall not interfere with, prevent or obstruct by any means the elimination of racial discrimination by local school officials in any school system in the State of Alabama.

X

*The 1965–1966 Tuition Grant Statute*

Title 52, Section 61(8), Code of Alabama (Tuition Grant Statute, No. 687, approved September 1, 1965), is hereby declared unconstitutional. The defendant state officials, their agents, employees, and successors in office shall not approve or permit the approval or the payment of any tuition grants or grants-in-aid under the authority of this law.

It is further ordered that the United States submit to this Court within 30 days, and serve upon all parties, a report informing the Court whether any of the school systems listed in Section IV of this decree have failed, following the entry of this Court's decree, to adopt a satisfactory desegregation plan.

It is further ordered that the costs of this action be and they are hereby taxed against the defendant state officials.

It is further ordered that jurisdiction of this cause be and it is hereby retained.

EXHIBIT "A" EXHIBIT "A"

DESEGREGATION PLAN

The ———— Board of Education will take the following affirmative action to disestablish all state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or encouraged racial discrimination in the operation of the school system:

I

EXERCISE OF CHOICE

The following provisions will apply to all grades commencing with the 1967–68 school year:

A. *Who May Exercise Choice.* A choice of schools may be exercised by a parent or other adult person serving as the student's parent. A student may exercise his own choice if he (1) is exercising a choice for the ninth or a higher grade, or (2) has reached the age of fifteen at the time of the exercise of choice. Such a choice by a student is controlling unless a different choice is exercised for him by his parent or other adult person serving as his parent during the choice period or at such later time as the student exercises a choice. Each reference in this plan to a student's exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult, or by the student himself.

B. *Annual Exercise of Choice.* All students, both white and Negro, will be required to exercise a free choice of schools annually.

C. *Choice Period.* The period for exercising choice will commence May 1, 1967, and end June 1, 1967, and in subsequent years will commence March 1 and end March 31 preceding the school year for which the choice is to be exercised. No student or prospective student who exercises his choice within the choice period will be given any preference because of the time within the period when such choice was exercised.

D. *Mandatory Exercise of Choice.* A failure to exercise a choice within the choice period will not preclude any student from exercising a choice at any time before he commences school for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who has not exercised his choice of school within a week after school opens will be assigned to the school nearest his home where space is available under standards for determining available space which will be applied uniformly throughout the system.

E. *Public Notice.* On or within a week before the date the choice period opens, the school board will arrange for the conspicuous publication of a notice describing the provisions of this plan in the newspaper most generally circulated in the community. The text of the notice will be substantially similar to the text of the explanatory letter sent home to parents. Publication as a legal notice will not be sufficient. Copies of this notice will also be given at that time to all radio and television stations serving the community. Copies of this plan will be posted in each school in the school system and at the office of the Superintendent of Education.

F. *Mailing of Explanatory Letters and Choice Forms.* On the first day of the choice period there will be distributed an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the school

board) of each student, together with a return envelope addressed to the Superintendent. The text for the explanatory letter and choice form will essentially conform to the sample letter and choice form appended to this plan.

G. *Extra Copies of the Explanatory Letter and Choice Form.* Extra copies of the explanatory letter and choice form will be freely available to parents, students, prospective students, and the general public at each school in the system and at the office of the Superintendent of Education during the times of the year when such schools are usually open.

H. *Content of Choice Form.* Each choice form will set forth the name and location of and grades offered at each school and may require of the person exercising the choice the name, address, age of student, school and grade currently or most recently attended by the student, the school chosen, the signature of one parent or other adult person serving as parent, or where appropriate the signature of the student, and the identity of the person signing. No statement of reasons for a particular choice, or any other information, or any witness or other authentication, will be required or requested.

I. *Return of Choice Form.* At the option of the person completing the choice form, the choice may be returned by mail, in person, or by messenger to any school in the school system or to the office of the Superintendent.

J. *Choices Not on Official Form.* The exercise of choice may also be made by the submission in like manner of any other writing which contains information sufficient to identify the student and indicates that he has made a choice of school.

K. *Choice Forms Binding.* When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and may not be changed except in cases of parents making different choices for their children under the conditions set forth in paragraph I-A of this plan and in exceptional cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student.

L. *Preference in Assignment.* In assigning students to schools, no preference will be given to any student for prior attendance at a school and except with the approval of the State Superintendent of Education in extraordinary circumstances, no choice will be denied for any reason other than overcrowding. In case of overcrowding at any school, preference will be given on the basis of proximity of the school to the homes of the students choosing it, without regard to race or color. Standards for determining overcrowding will be applied uniformly throughout the system.

M. *Second Choice Where First Choice Is Denied.* Any student whose choice is denied will be promptly notified in writing and given his choice of any school in the school system serving his grade level where space is available. The student will have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.

N. *Transportation.* Where transportation is generally provided, buses will be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing the school nearest his residence must be transported to the school to which he is assigned under these provisions, whether or not it is his first choice, if that school is at least two miles from his residence. The school system will adopt nondiscriminatory bus routes and criteria governing the availability of bus transportation to students, so that race will not be a basis for assigning students to school buses and overlapping and duplicative bus routes based on race will be eliminated. Prior to the choice period, parents and children will be advised that such routes and criteria will be adopted, and substantially prior to the opening of the 1967–68

school year the parents and children will be notified of the routes and criteria, in a readily understandable manner.

O. *Officials Not to Influence Choice.* At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, or any student, in the exercise of a choice or favor or penalize any persons because of a choice made. If the school board employs professional guidance counselors, such persons will base their guidance and counseling on the individual student's particular personal, academic, and vocational needs. Such guidance and counseling by teachers as well as professional guidance counselors will be available to all students without regard to race or color.

P. *Protection of Persons Exercising Choice.* Within their authority, school officials are responsible for the protection of persons exercising rights under or otherwise affected by this plan. They will, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference will include harassment, intimidation, threats, hostile words or acts, and similar behavior. The school board will not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this plan. If officials of the school system are not able to provide sufficient protection, they will seek whatever assistance is necessary from other appropriate officials.

## II

### PROSPECTIVE STUDENTS

Each prospective new student will be required to exercise a choice of schools before or at the time of enrollment. Each such student known to the school system will be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon thereafter as the school system learns that he plans to enroll. Where there is no preregistration procedure for newly entering students, copies of the choice forms will be available at the office of the Superintendent and at each school during the time the school is usually open.

## III

### SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

No student will be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by or affiliated with the school in which he is enrolled. A student attending school for the first time on a desegregated basis will not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to longstanding, nonracially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are opened to persons other than enrolled students, will be open to all persons without regard to race or color. All special educational programs conducted by the school system will be conducted without regard to race or color.

## IV

### SCHOOL EQUALIZATION

A. *Inferior Schools.* In schools heretofore maintained for Negro students, the school system will take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white persons. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios will, to the extent feasible, be

distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this subparagraph, such school will be closed as soon as possible, and students enrolled in the school will be reassigned on the basis of freedom of choice. By October of each year, the school board will report to the State Superintendent of Education pupil-teacher ratios, pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and will outline the steps to be taken and the time within which they will accomplish the equalization of such schools.

B. *Remedial Programs.* The school system will provide remedial education programs which permit students attending or who have previously attended all-Negro schools to overcome past inadequacies in their education.

### V

### SCHOOL CONSTRUCTION AND CONSOLIDATION

To the extent consistent with the proper operation of the school system as a whole, the school board will, in locating and designing new schools, in expanding existing facilities, and in consolidating schools, do so with the object of eradicating past discrimination and of effecting desegregation. The school board will not build, consolidate or expand schools based on recommendations of any state survey conducted prior to March 1967 unless the state reapproves such building, consolidation or expansion. The school board will not fail to consolidate schools because desegregation would result.

### VI

### FACULTY AND STAFF

A. *Faculty Employment and Assignment.* Race or color will not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race will be taken into account for the purpose of correcting the effect of the past segregated assignment of teachers in the dual system. Teachers, principals, and staff members will be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers will be assigned so that more than one teacher of the minority race (white or Negro) will be on a desegregated faculty. The school board will take affirmative steps to accomplish the desegregation of its school faculties, including substantial desegregation of faculties in as many of the schools as possible for the 1967–68 school year. The objective of the school system is that the pattern of teacher assignment to any particular school 'shall not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school. The school system will accomplish faculty desegregation in a manner whereby the abilities, experience, specialties, and other qualifications of both white and Negro teachers in the system will be, insofar as administratively feasible, distributed evenly among the various schools of the system.

B. *Dismissals.* Teachers and other professional staff members will not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system will be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system will be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the

reasons therefor, shall be filed with the State Superintendent of Education.

## VII

## REPORTS

A. *Report on Choice Period.* The school system will file with the State Superintendent of Education on or before June 10 of each year a report tabulating by race the number of choice applications and transfer applications received for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report will also state any reasons relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.

B. *Report After School Opening.* The system will file with the State Superintendent of Education within 15 days after the opening of schools for the fall semester of each year a report setting forth the following information:

(1) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any action taken on his request and the reasons therefor.

(2) The number of faculty vacancies, by school that have occurred or been filled since the adoption of this plan or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

(3) The number of students by race, in each grade of each school.

## EXPLANTORY LETTER

(School System Name and Office Address)

(Date Sent)

Dear Parent:

All grades in our school system will be desegregated next school year. Any student who will be entering one of these grades next year may choose to attend any school in our system, regardless of whether that school was formerly all white or all Negro. It does not matter which school your child is attending this year. You and your child may select any school you wish.

Every student, white and Negro, must make a choice of schools. If a child is entering the ninth or higher grade, or if the child is fifteen years old or older, he may make the choice himself. Otherwise a parent or other adult serving as parent must sign the choice form. A child enrolling in the school system for the first time must make a choice of schools before or at the time of his enrollment.

The form on which the choice should be made is attached to this letter. It should be completed and returned by June 1, 1967.* You may mail it in the enclosed envelope, or deliver it by messenger or by hand to any school principal or to the office of the Superintendent at any time between May 1 and June 1. No one may require you to return your choice form before June 1 and no preference is given for returning the choice form early.

No principal, teacher or other school official is permitted to influence anyone in making a choice or to require early return of the choice form. No one is permitted to favor or penalize any student or other person because of a choice made. A choice once made cannot be changed except for serious hardship.

No child will be denied his choice unless for reasons of overcrowding at the

---

* In subsequent years the dates in both the explanatory letter and the choice form should be changed to conform to the choice period.

school chosen, in which case children living nearest the school will have preference.

Transportation will be provided, if reasonably possible, no matter what school is chosen. The school board is rerouting buses and writing new rules for assigning students to buses, so that there will be no more overlapping bus routes and students will be assigned to buses without regard to race. (Delete if the school system does not provide transportation.)

Your school board and the school staff will do everything we can to see to it that the rights of all students are protected and that desegregation of our schools is carried out successfully.

Sincerely,
Superintendent

## CHOICE FORM

This form is provided for you to choose a school for your child to attend next school year. You have 30 days to make your choice. It does not matter which school your child attended last year, and does not matter whether the school you choose was formerly a white or a Negro school. This form must be mailed or brought to the principal of any school in the system or to the office of the Superintendent (address), by June 1, 1967. A choice is required for each child.

Name of child _____

 (Last) (First) (Middle)

Address _____

Name of parent or other
adult serving as parent_____

If child is entering first grade, date of birth:

 (Month) (Day) (Year)

Grade child is entering _____

School attended last year _____

Choose one of the following schools by marking an X
beside the name.

| | Name of school | Grades Offered | Location |
|---|---|---|---|
| ( ) | _____ | _____ | _____ |
| ( ) | (All schools in the district, the grades offered by each, and the location of each will be listed on the form prior to its distribution to parents and students.) | | |
| ( ) | _____ | _____ | _____ |
| ( ) | _____ | _____ | _____ |

Signature _____

Date _____

To be filled in by Superintendent:

 School assigned _____