**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dedra Estell OVERTON, et al., Plaintiffs-Intervenors, Appellants,**

v.

**TEXAS EDUCATION AGENCY, et al., Defendants-Appellees.**

**Samantha PRICE, et al., Plaintiffs-Appellants,**

v.

**AUSTIN INDEPENDENT SCHOOL DISTRICT, et al., Defendants-Appellees.**

**Nos. 87–1576, 87–1635.**

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1987.

Napoleon B. Williams, Jr., Julius L. Chambers, New York City, for Price, et al.

Norma V. Cantu, Maldef, Albert H. Kauffman, San Antonio, Tex., Antonia Hernandez, E. Richard Larson, Los Angeles, Cal., for Diana Castaneda.

Wm. Bradford Reynolds, Clint Bolick, Dennis J. Dimsey, David K. Flynn, Washington, D.C., for U.S.

William H. Bingham, James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for Texas Educ. Agency, et al.

Norma Cantu, San Antonio, Tex., Antonia Hernandez, E. Richard Larson, Los Angeles, Cal., for Herrera.

David Van Os, Austin, Tex., for Harrington, amicus.

James Austin Pinedo, Austin, Tex., interested party for United South Austin.

William H. Bingham, James R. Raup, Austin, Tex., for Austin ISD.

Wm. Bradford Reynolds, Clint Bolick, Spec. Asst. Atty. Gen., Civil Rights Div., Dennis J. Dimsey, David K. Flynn, Washington, D.C., for amicus, U.S.

Before WILLIAMS and
HIGGINBOTHAM, Circuit Judges, and
BROWN *, District Judge.

PATRICK E. HIGGINBOTHAM,
Circuit Judge:

In 1980, after ten years of litigation, the Austin Independent School District consented to a decree contemplating that in three years the school district would be declared unitary and the case dismissed. In July, 1987, some four years after a judicial declaration that the AISD had achieved unitary status, the Overton appellants, Plaintiff-Intervenors in the earlier AISD litigation, requested further relief because AISD allegedly had violated the terms of the consent decree. The district court observed that the case had been dismissed, concluding that it was "no longer empowered to enforce the consent decree."

On August 7, 1987, Price appellants filed a new lawsuit seeking relief similar to that denied in the Overton case. The district court denied their request for a preliminary injunction because the Price-Plaintiffs had failed to prove the required purposeful discrimination. The district court also found that the Price-Plaintiffs were tardy in seeking injunctive relief and, with the opening of schools at hand, the granting of requested relief would have been disruptive, if not impossible, 671 F.Supp. 484.

We are persuaded that the original consent decree is no longer enforceable both by its own terms and because a school district fettered by such a decree does not enjoy unitary status as we have defined it. We accordingly affirm the district court's rejection of the effort to resurrect the Overton litigation. We also are persuaded that the district court properly denied the preliminary injunction in the Price case for failure to demonstrate a likelihood of success on the merits due to a lack of proof of purposeful discrimination, and because of the disrupting effect of the requested relief upon the opening of school.

I

*The Overton Case*

The Austin desegregation litigation was settled by a consent decree entered on January 2, 1980.[1] One provision of the consent decree is of particular concern here:

For a period of three years from the date of the entry of this Consent Decree, AISD shall remain under the jurisdiction of this Court. This case shall be placed on the inactive docket, but the Court shall be available at all times to perform the duties and functions set out herein. At the end of three years from the date of entry of this Consent Decree and notice to the parties, unless there is objection by the parties hereto, AISD shall be declared to be a unitary school system and this case shall be dismissed.

Thus the consent decree provided specifically that the district court was to retain jurisdiction only for three years, after which AISD would be declared unitary and the case dismissed, unless a party objected.

The Overton-Plaintiffs did object and the parties entered into negotiations that resulted in a motion to dismiss accompanied by a stipulation providing that objections would be withdrawn and AISD declared unitary. The stipulation contemplated that during its life the district court would conduct a hearing if AISD substantially changed its student assignment plan and was said to unlawfully discriminate against AISD students; AISD would then be required to demonstrate why the case should not be reopened. The life of the stipulation was governed by the following provision:

This stipulation shall remain in effect until January 3, 1986, and is enforceable by any of the parties thereto during that period. If Kealing Junior High School is not constructed substantially in accord-

---

* District Judge of the Eastern District of Texas, sitting by designation.

1. The background of the case is set out in *United States v. Texas Educ. Agency,* 467 F.2d 848 (5th Cir.1972); *United States v. Texas Educ. Agency,* 532 F.2d 380 (5th Cir.), *vacated,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976); *United States v. Texas Educ. Agency,* 564 F.2d 162 (5th Cir. 1977); and *United States v. Texas Educ. Agency,* 579 F.2d 910 (5th Cir.1978), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

ance with the schedule contained in Exhibit "A", and paragraph (c) of this stipulation, this stipulation shall be extended until its completion.

On June 14, 1983, the district court entered an order declaring AISD unitary and dismissed the case without prejudice. Kealing Junior High School was completed in September, 1986.

On April 13, 1987, AISD's Board of Trustees adopted a student assignment plan retaining majority to minority transfer, but eliminating most of the busing required by the consent decree. The new plan would cause 16 of a total of 65 elementary schools to be racially identifiable. Overton-Plaintiffs opposed the plan as an "abandon[ment of] the plan of desegregation for grades K–6...." They admit that the Overton case was dismissed but argue that the district court nonetheless retained the power to enforce the consent decree, relying in part upon *Dowell v. Board of Education.* [2] It is argued, by analogy to consent decrees in other civil litigation, including antitrust and securities cases, that dismissal of the case did not end AISD's obligations under the decree. We are not convinced.

■ The consent decree is unenforceable for three related reasons. First, it expired by its own terms. The stipulation was to remain in effect until January 6, 1986, or until construction of Kealing Junior High School was completed, whichever occurred later, and was to be "enforceable by any of the parties thereto *during that period.*" (emphasis supplied). While the consent decree does not explicitly provide a date for its termination, it cannot fairly be read to operate in perpetuity, as appellants would have it. The parties negotiated for a three year period within which any party could object further and specifically left the decree open until certain other conditions were met, which were. This bargain loses

sense if dismissing the lawsuit did not terminate the consent decree.

■ Second, the consent decree cannot lie alongside a final declaration that the school district is unitary. The assertion that a district court retains superintendence of a school district by the terms of a consent decree entered in a lawsuit later dismissed cannot be reconciled with the declaration that the district has achieved unitary status and is free of judicial superintendence.

Appellants rely upon *Dowell v. Board of Education.* [3] After being found unitary, the Oklahoma City school district instituted a reassignment plan that caused some schools to be racially identifiable. In rejecting an attack upon the plan, the district court required proof of discriminatory purpose, holding that earlier findings of discrimination would not suffice. The Tenth Circuit reversed, concluding that the reassignment plan violated the terms of an injunction entered in the litigation. The appellate court placed upon the defendants the burden of showing either that changed conditions required modification of the injunction or that the facts or law no longer required its enforcement; the plaintiffs needed only to demonstrate the order was being violated.[4]

The Fourth Circuit reached the opposite conclusion, however, in *Riddick v. School Board.* [5] The *Riddick* court explained that a district court was required to retain jurisdiction only until it determined that the district had become unitary; "once the goal of a unitary school system is achieved, the district court's role ends." [6] The *Dowell* court disagreed with *Riddick*, suggesting that "the [Fourth Circuit] makes a bridge between a finding of unitariness and voluntary compliance with an injunction." It also suggested that *Riddick* was inconsistent with our decision in *Lee v. Macon*

---

2. 795 F.2d 1516 (10th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

3. 795 F.2d 1516 (10th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

4. *Id.* at 1523.

5. 784 F.2d 521 (4th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

6. *Id.* at 535.

*County Bd. of Education,*[7] in which we allowed a petitioner in a pending case to amend a school plan after finding that a school was "unitary in nature." The *Dowell* court pointed to our observation that public school officials, after full responsibility has been returned to them by the federal courts, " 'are bound to take no actions which would reinstitute a dual school system.' "[8] It asserted that "the purpose of court-ordered school integration is not only to achieve, but also to *maintain,* a unitary school system."[9]

*Dowell*'s description of our jurisprudence is incorrect. We did observe in *Lee v. Macon County* that a unitary district is "bound to take no actions which would reinstitute a dual school system" and that school districts should maintain unitary status once achieved.[10] In doing so, however, we relied upon the Supreme Court's observation that "in the absence of a showing that either the school authorities or some other agency of the State has *deliberately* attempted to fix or alter ... the racial composition of the schools, further intervention by a district court should not be necessary."[11] Three school years from the declaration of unitary status had not passed,[12] and Judge Hand had not dismissed the suit against the Macon County Board of Education. We observed that because the case was still pending, the "District Court appears to have had subject matter jurisdiction over the case."[13] Judge Hand did not, and we did not, enforce any provision of a desegregation plan. Rather we found that no constitu-

tional violation had been proved. Indeed, we have set aside a permanent injunction issued by a district court explaining that such injunctions "should be effective only so long as might be necessary to achieve the purpose" and should end when the district is unitary.[14]

The difficulty with *Dowell*'s approach is that it denies meaning to unitariness by failing ever to end judicial superintendence of the schools. Of course, school districts cannot escape the duty to maintain their school systems in conformity with the Constitution. Attaining unitary status, however, means that a school board is free to act without federal supervision so long as the board does not purposefully discriminate; only intentional discrimination violates the Constitution.[15] As we have said, a school district is released from the consequences of its past misdeeds when it eliminates the vestiges of a segregated system and achieves a true unitary system.

We also are unconvinced that the end of judicial superintendence that accompanies unitary status means only that a superintending injunction and a pending suit are absent; rather, we are convinced that it must also be accompanied by a release of a unitary district from the burden of proving that its decisions are free of segregative purpose. Perpetuating the requirement that a school district convince a federal judge that its decisions are sufficiently pure is said to be warranted for two reasons. First, because a district that has been guilty of purposeful discrimination is

7.  584 F.2d 78 (5th Cir.1978).

8.  *Dowell,* 795 F.2d at 1520 n. 4 (quoting *Lee,* 584 F.2d at 81).

9.  *Id.* at 1520 (emphasis in original).

10.  *Lee,* 584 F.2d at 81.

11.  *Swann v. Charlotte–Mecklenburg Board of Educ.,* 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971) (emphasis supplied).

12.  *Youngblood v. Board of Public Instruction,* 448 F.2d 770, 771 (5th Cir.1971). In *Youngblood* we required the district court to retain jurisdiction over a school desegregation case for three years after the court had declared the

system unitary and dismissed the case. During those three years the school district was required to file semi-annual reports. At the end of the three years the district court was required to provide notice and a hearing to the plaintiffs to show why the case should not be dismissed. Only then could the court dismiss the case. *Id.* at 771.

13.  *Id.* at 82.

14.  *Augustus v. School Board of Escambia County,* 507 F.2d 152, 158 (5th Cir.1975) (C.J. Roney).

15.  *Personnel Administrator v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

sufficiently likely to return to its bigoted ways, it is fair to require a school district to prove that it is not motivated by intentional discrimination. Second, the party with superior knowledge of the facts is better able to prove its intent, and superior access to proof is a common justification for allocating the burden of proof. Thus, the argument goes, schools are freed of federal intrusion by lifting any superintending injunction and dismissing the suit because a school district thereafter is answerable to a federal court only if a suit is filed; at the same time, not insisting on proof of segregative purpose catches any tendency to backslide.

It is not so simple. The elements of a violation and who must bear the burden of their proof are not conceptually distinct from unitary status but are its components; indeed, the contrary assertion is dissembling. In the real world of trial and uncertain proofs, a perpetual placement upon a school board of the burden of persuading its innocence of conduct with segregative impact differs little in effect from the superintendence that attends an extant decree and pending suit. The argument is little more than a semantic recasting of unitary status to mitigate loss of federal control over school districts, a loss seen as increasing the risk of losing gains made. The argument's essence is that school districts that have intentionally discriminated are not to be trusted with the freedom of the Constitution. It rests upon a fear that the fourteenth amendment, proscribing as it does only purposeful discrimination, inadequately protects desegregation gains, at least at the hand of a former wrongdoer.

We are not persuaded. Whatever the power of Congress to so circumscribe the freedom of state actors, such as not requiring proof of purposeful discrimination in employment, the contended for judicial rule is here a heady call for raw judicial power. It is not that we deny the risk; the risk of

wrong decision is inherent in the freedom to choose, and we are not so naive as to believe that we are no longer vulnerable to racism, if such insights are to overtly inform our judgment.

Regardless, we can assist the definition of unitariness by explaining our view of what it is not. We see *Dowell*'s effort to declare a school district to be unitary while retaining jurisdiction as an illusion that denies the essence of unitariness. The carrot of unitariness can be a meaningful incentive for school districts to desegregate only if we abide by our promise to release federal control when the job is done. The rule contended for would breach our implicit promise of release. This is so whether the rule finds expression as a maintenance of a decree or dispensing with proof of purpose or shifting the burden of proof.

■ Third, enforcing the decree in the face of a declaration of unitariness would violate the familiar equitable principle that judicial power should "extend no farther than required by the nature and extent of [the] violation."[16] We do no more than follow decisions of the Supreme Court that

> having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.[17]

In short, continuing limits imposed as a remedy after the wrong is righted effectively changes the constitutional measure of the wrong itself; it transposes the dictates of the remedy for the dictates of the constitution and, of course, they are not interchangeable. Stated another way, the constitutional violation is purposeful separation of races in public education. The mix that would have occurred but for the racism is a judicially created hypothetical. We have insisted upon matching that model of a unitary or desegregated status as a

---

**16.** *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 399, 102 S.Ct. 3141, 3154–55, 73 L.Ed.2d 835 (1982).

**17.** *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 436–37, 96 S.Ct. 2697, 2705, 49 L.Ed.2d

599 (1976); *see United States v. Lawrence County School District,* 799 F.2d 1031, 1052, 1055–56 (5th Cir.1986) (Higginbotham, J., concurring); *Morgan v. Nucci,* 831 F.2d 313 (1st Cir.1987).

remedy for the wrong. Refusing, after the match, to allow a school district to vary from that model unless it proves its "non-segregative" purpose confuses wrong and remedy.[18]

Relatedly, accommodation of federal superintendence and federalism will not tolerate the idea that although the wrong is righted, the magnitude of the past wrong nonetheless justifies perpetuation of a federal order limiting the ambit of a school district's self-governance. It is state government that we are asked to enjoin. Surely, faithfulness to federalism counsels that having righted the wrong, the limits we will impose on the state can be drawn no more tightly than the limits of the Constitution. The vertical space incident to federalism commands, at the least, this range of trust.

We are not alone. In *Morgan*, the First Circuit not only concluded that unitary status can be achieved in an incremental fashion, but that the consequence of achieving unitary status as to school assignments was the court's refusal to enforce injunctive provisions regarding assignment. As the *Morgan* court phrased it, a school district's attainment of unitary status

> represents the "accomplishment" of desegregation, and is the ultimate goal to which a desegregation court tailors its remedies once a finding of intentional discrimination is made. Although the [Supreme] Court has produced no formula for recognizing a unitary school system, the one thing certain about unitariness is its consequences: the *mandatory* devolution of power to local authorities. Thus, when a court finds that discrimination has been eliminated "root and branch" from school operations, it must abdicate its supervisory role.[19]

We agree.

In sum, the idea that a school district can be declared unitary and yet be answerable to the federal courts for failure to abide by desegregation plans, regardless of segregative purpose, is at war with itself. When the federal court, with full agreement of all parties and in full compliance with our rules,[20] declared Austin Independent School District unitary, it released the school district from federal judicial superintendence, leaving it on the same footing with other state actors. Thus we can find no fault with either the district court's refusal to reopen the Overton litigation or its unwillingness to enforce a consent decree that already had lapsed.

## II

### *The Price Case*

■ On August 7, two weeks after the district court denied relief to the Overton-Plaintiffs, the Price appellants filed suit and asked the district court to preliminarily enjoin implementation of the AISD student assignment plan. After a hearing, the district court denied the requested injunction for failure to satisfy two of its prerequisites: there was not a substantial likelihood of success on the merits or a showing that the threatened harm to plaintiffs outweighed any potential injury the injunction would cause AISD.[21]

Abuse of discretion governs our review of the district court's denial of the injunction and we note that a preliminary injunction is a drastic remedy for which the movant has a heavy burden.[22] The Price appellants have not carried their burden for both the reasons found by the district court.

First, the Price appellants have not shown a substantial likelihood of success on the merits. As we previously have noted, they cannot rely on the consent decree because it already has expired. There was no injunction and consequently there is no

---

**18.** *See Williams v. City of New Orleans,* 729 F.2d 1554, 1564, 1566–70 (5th Cir.1984) (en banc) (Higginbotham, J., concurring).

**19.** *Morgan,* 831 F.2d at 318.

**20.** *Youngblood v. Board of Public Instruction,* 448 F.2d 770, 771 (5th Cir.1971).

**21.** *See Lindsay v. San Antonio,* 821 F.2d 1103, 1105 (5th Cir.1987).

**22.** *See Enterprise Internat'l, Inc. v. Corporacion Estatal,* 762 F.2d 464, 472 (5th Cir.1985).

merit in appellants' argument that they likely will succeed because AISD has violated the decree.

Appellants also failed to demonstrate a likelihood of success because they were unable to prove purposeful discrimination. Again, a finding of unitariness and dismissal under *Youngblood* means that a school district has removed the taint of prior discrimination and attained the same legal status as a district that never has discriminated. Thus, in order to show a constitutional violation appellants must establish that AISD adopted the new student assignment plan with the purpose of discriminating; the fact that the plan results in racially identifiable schools is alone insufficient.

The district court found that discriminatory purpose did not prompt the plan's adoption. The court instead found that overcrowding, concern over long time-consuming bus routes, the requirements of new and sweeping Texas education legislation, and shifts in the student population all informed the board's decision. The court found credible the testimony of AISD's superintendent, Dr. John Ellis, that the board relied on these factors and was not motivated by discriminatory intent. Indeed, Board Member Abel Ruiz, who testified as to the importance of Anglo economic and political power in the decision to adopt the plan, did not assert that discriminatory purpose prompted the plan. The district court's factual finding that discriminatory purpose was not a factor is not clearly erroneous and we decline to substitute our judgment. Without a finding of purpose appellants cannot demonstrate a likelihood of success and thus the preliminary injunction was properly denied.

The motion also properly was denied because the appellants had failed to show that the injury to them without an injunction outweighed any injury an injunction would cause AISD. At the time the injunction was denied, only twelve days remained until the beginning of the school year. As the district court found, the injunction would have disrupted the school session. Teachers, principals, and students all would have had to be reassigned. Boundaries would have been redrawn and supplies moved.

AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, specially concurring:

I am in agreement with the result reached by the panel in this case. I am also in agreement that the *Overton* case has been properly dismissed and is not before the Court.

This opinion is written to express my strong interest in a refocussing of the emphasis of the Court's opinion in the *Price* case. I would emphasize, and indeed make it the sole basis of the decision, that the injury to the plaintiffs without an injunction was clearly outweighed by the injury the injunction would have caused the AISD only 12 days before the beginning of the school year. The opinion for the Court mentions this ground for the denial of the preliminary injunction only in one brief final paragraph. It deserves the controlling attention. There simply could be no justification for the disruption of the entire school year by an injunction so late in time. The order at issue in this case is limited to elementary schools. The disruption could well have been catastrophic to an effective school year for the elementary schools, admittedly at a highly critical time in the educational life of children. So I agree that the preliminary injunction should not have been issued.

I am concerned about the implied finality with which the majority opinion considers a lack of merit in the claims of the plaintiffs in the *Price* case. While the hearing was thorough in the context of the time available, the majority opinion virtually forecloses the possibility of appellants proving their case of intentional discrimination. I assume that the testimony of the school superintendent was absolutely honest and sincere. Yet a careful factual, sociological and psychological study might, upon thorough development, be adequate to prove discriminatory intent.

The plaintiffs have the right to undertake such proof now for the next school

year. I simply feel that this Court should be totally neutral with respect to the possibilities of such proof. It was not necessary to consider this issue in view of the obvious proper denial of the preliminary injunction because of the time factor involved. The plaintiffs may or may not be able to mount a substantial case undertaking to prove intentional discrimination. But it is unnecessary for us to hint at what the result would be if they do make such an undertaking. They have a right to try to prove their case. While the majority opinion does not deny them that right, it carries a strong implication of little likelihood of success even before they start. I would leave that decision entirely for the future.