**Anthony T. LEE, et al., Plaintiffs**

**United States of America, Plaintiff–Intervenor and Amicus Curiae,**

**National Educational Association, Inc., Plaintiff–Intervenor,**

v.

**MACON COUNTY BOARD OF EDUCATION, et al., Defendants.**

Civ. A. No. 70–AR–0251–S.

United States District Court, N.D. Alabama, M.D.

March 18, 1988.

Janell M. Byrd, New York City, Oscar W. Adams, III, Birmingham, Ala., Solomon S. Seay, Jr., Montgomery, Ala., for plaintiffs and plaintiff-intervenor, National Educational Ass'n.

John R. Moore, Asst. Atty. Gen., U.S. Dept. of Justice, Civil Rights Div., Equal Opportunities Litigation Section, Washington, D.C., Frank W. Donaldson, U.S. Atty., Caryl Privett, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-intervenor, U.S. of America.

Jeff Foshee, Edward George, Dept. of Postsecondary Educ., Montgomery, Ala., for defendant, Nunnelley State Technical College.

## MEMORANDUM OPINION

ACKER, District Judge.

On March 1, 1988, this court conducted an oral hearing during which this court heard arguments and asked questions, *inter alia*, respecting the issue of whether or not Nunnelley State Technical College (Nunnelley) should be declared to have achieved and satisfactorily maintained unitary status as a racially desegregated educational entity for a sufficient period of time so as to call for a dismissal of the above-entitled action as to Nunnelley and to remove Nunnelley from the continuing supervisory jurisdiction of this court.

The "granddaddy" decision in this case is *Lee v. Macon County Board of Education*, 267 F.Supp. 458 (M.D.Ala.1967) (Rives, J., Grooms, J., and Johnson, J., *per curiam*) aff'd sub nom. *Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed. 2d 422 (1967). This first panel decision with statewide impact followed initial rulings in 1963 ordering the desegregation of the Macon County School System. *Lee v. Macon County*, 221 F.Supp. 297 (M.D.Ala. 1963). From this beginning there has been such a proliferation of opinions and orders

by so many and varied district judges, district panels, and appellate courts that it is virtually impossible to follow the story as it runs through the voluminous court files and as the story may apply to each separate instructional entity involved. When the undersigned judge came on the bench in 1982, he was assigned a number of the entities then under the supervisory jurisdiction of the court under the *Lee v. Macon* umbrella. These entities had been equitably divided among the federal district court judges of the State of Alabama. The undersigned, his secretary, his docket clerk, his law clerks, and various archivists, separately and severally, have spent a great number of hours trying to reconstruct the plot and story line for those institutions assigned to this judge, a task made more difficult by the fact that this judge came in during the third act of an important but lengthy and complex drama. Except to the extent that any pieces of the puzzle as applied to Nunnelley may have "slipped through the crack" (a distinct possibility not only in view of the voluminosity of the court files, but also considering the recent relocation of all of the archived files for the Northern District when the court moved into its new quarters in July of 1987), the following pertinent procedural facts appear:

1. On March 22, 1967, a three-judge panel comprised of Judges Rives, Grooms and Johnson, in a *per curiam* opinion, held *inter alia:*

> The state's trade schools, vocational schools and state colleges continue to be operated on a segregated basis. The operation of these systems is the immediate responsibility of the State Board of Education.

267 F.Supp. at 474 (footnotes and citations omitted).

> [T]he State of Alabama and particularly the defendant state officials are under an affirmative constitutional duty to take whatever corrective action is necessary to disestablish such a system. Faculty members and staff members, facilities and activities, as well as student bodies, must be desegregated to such an extent that there no longer exists in the Ala-

bama public school system discrimination of any sort or to any degree that is based upon race or color.

267 F.Supp. at 478.

> [T]he Alabama State Board of Education, and Alabama State Superintendent of Education, together with their agents, servants, employees, successors in office, and all those in active concert or participation with them who receive actual notice of this decree ..., shall be and hereby are permanently enjoined from discriminating on the basis of race in the operation or the conduct of the public schools of Alabama or in any manner pertaining to the public schools of Alabama.

267 F.Supp. at 480.

2. Nunnelley was not specifically named in the decree of March 22, 1967, but it certainly came within the generic description of the institutions enjoined by the decree, because it was then a trade school under the supervision of the Alabama State Board of Education.

3. On August 14, 1970, in another *per curiam* decision, *Lee v. Macon*, 317 F.Supp. 103 (M.D.Ala.1970), the same three-judge panel dealt directly with desegregation of the State's junior colleges and trade schools. Again, Nunnelley, which is located in Talladega County, was not mentioned by name. Nevertheless, the injunction issued on August 14, 1970 required specific desegregation responses from all institutions under the Alabama State Board of Education. It quite clearly applied to institutions in Nunnelley's category.

4. On May 29, 1972, the same three-judge court transferred jurisdiction over Alabama's various junior colleges and trade schools in *Lee v. Macon* to those district courts in the geographic areas where the various affected state instructional institutions are located. This meant, of course, that the implementation of prior decrees, and further court activity respecting Nunnelley, was transferred to the Northern District of Alabama, and ultimately to this judge. Prior to May 29,

1972, the public school systems had similarly been transferred.

5. On August 4, 1975, Judge Johnson, then of the Middle District, signed a "consent decree" in *Lee v. Macon*, triggered by a motion for further relief filed by plaintiff-intervenor, National Educational Association, Inc. (NEA), claiming that "the defendants have failed to substantially desegregate each of the 13 predominantly white junior colleges and technical institutes within the Middle District." By its terms, Judge Johnson's decree ordered the elimination of all forms of racial discrimination in "all junior colleges and technical schools operated by the defendants," clearly purporting to cover all of Alabama's post-secondary institutions. The decree was not limited to those entities located in the Middle District. Its injunction, then, obviously included Nunnelley.

6. On May 26, 1977, Judge Johnson entered an order acknowledging that his "consent decree" of August 4, 1975 "was not intended to and did not have the effect of revesting jurisdiction in the Middle District," but was only entered "as a convenience to the attorneys for the litigants."

7. On August 17, 1977, NEA filed in the Northern District a motion for supplemental relief. This motion sought, *inter alia,* to establish hiring goals and quotas for the predominantly white junior colleges and technical schools within the Northern District so as to accomplish the faculty desegregation provisions of the August 4, 1975 consent decree approved by Judge Johnson. No relief was sought with regard to any so-called predominantly black junior colleges, except for certain individual claims of faculty members dismissed from Lawson State Community College, a predominantly black institution. It is interesting and provocative to note that plaintiffs have never complained of a shortage of white students and faculty at the predominantly black post-secondary schools.

8. On August 22, 1977, Judge Hancock of this court entered an order responding to NEA's said motion. Judge Hancock said, *inter alia:*

No ... activity with regard to the matter has been filed in this court or been brought to the attention of this court since May 30, 1972, until August 17, 1977, when a motion for supplemental relief was filed herein.

Judge Hancock required the Alabama State Board of Education and the State Superintendent of Education to file a written answer or response on or before September 23, 1977.

9. On October 27, 1977, Judge Hancock denied NEA's motion for relief as to the individual Lawson State faculty members, without prejudice to their right to pursue individual actions. This order set for hearing, and established briefing schedules for, NEA's remaining requests in regard to hiring goals and quotas for faculty and staff in the predominantly white junior colleges and technical schools, as sought in the August 17, 1977 motion.

10. Judge Hancock granted a series of extensions of the deadlines set out in his October 27, 1977 scheduling order in an ongoing attempt to settle the issues raised in NEA's August 17, 1977 motion. On April 21, 1978, NEA filed yet another motion for a continuance of the hearing date and time tables. NEA supported its said motion by first reciting the results of its review of employment records relating to recruitment, vacancies, applications for employment and hiring practices in all of the trade schools and junior colleges within the Northern District. This review had ostensibly been carried out in order to monitor compliance with the terms of the August 4, 1975 consent decree. With respect to Nunnelley, the NEA alleged:

That the records reflect what can be interpreted as a good-faith effort on the part [of Nunnelley] to comply with the Consent Order entered herein on August 4, 1975, by the United States District Court for the Middle District of Alabama.

\* \* \* \* \* \*

That each of the above-said schools has 10% or more black faculty, and an analysis of the available records on vacancies occuring [sic], qualifications of available

applicants, qualifications of the persons hired and the recruitment practices indicate an effort, thus far, to increase minority faculty representation.

NEA's motion further proposed that NEA "monitor the hiring practices of each institution throughout the current reporting period" and proposed further action in the event the next report should show a continuing lack of compliance.

11. On May 9, 1978, Judge Hancock overruled NEA's motion for a continuance and dismissed NEA's August 17, 1977 motion for supplemental relief without prejudice to NEA's or any other party's right to petition for further relief should it become appropriate at a subsequent time. Judge Hancock, in effect, then, found that as of May 9, 1978, Nunnelley had satisfactorily complied with the previous orders of this court. This implicit adjudication of compliance by Nunnelley was not appealed. What NEA thereafter did, if anything, by way of monitoring Nunnelley's hiring and other employment practices, is conspicuously absent from the court files.

12. There is nothing which this judge, his docket clerk, or his law clerks can find in the court files to indicate that Nunnelley subsequently failed to file any of the yearly reports which it was required to file under the terms of the August 4, 1975 consent decree, or under any other court order, or that plaintiffs or plaintiff-intervenors have ever submitted any criticism of Nunnelley's desegregation efforts until after the recent order to show cause was issued.

13. On March 13, 1985, the undersigned, by the consent of plaintiffs and plaintiff-intervenors, dismissed *Lee v. Macon* as it had been applied to Talladega County Board of Education (located in the county where Nunnelley is located), and fully released Talladega County School System from the supervision of this court under *Lee v. Macon*, declaring that system "unitary." No party has since attacked or otherwise objected to this final dismissal, although the Talladega County Board of Education, an entity theretofore under this court's supervision, offered no actual evidence of its unitary status at the time of its dismissal, other than as may have been contained in its previous reports. What investigation, if any, was conducted by plaintiffs or by plaintiff-intervenors prior to their consent to this dismissal, nowhere appears in the files.

14. On October 23, 1987, this court issued its order to show cause on or before November 23, 1987, why this action should not be dismissed with respect to Nunnelley and the other institutions and school systems under the continuing supervisory jurisdiction of this judge. The court's order pointed out, *inter alia*, that for years there had been "no docketed case activity whatsoever regarding Nunnelley Technical College."

15. On November 23, 1987, the State Superintendent of Education responded to the show cause order, asserting, *inter alia:*

> The [1982] legislation creating the office of Chancellor [of the Department of Post Secondary Education] shifted all authority from the office of State Superintendent to the office of Chancellor. Since 1982 the State Superintendent has not been responsible for trade and vocational schools and two-year colleges, including Nunnelley....

No one has disputed this assertion. It correctly reflects the law of Alabama.

16. On November 23, 1987, Nunnelley responded to the show cause order, asserting, *inter alia:*

> It is the position of the [Alabama State Board of Education] that Nunnelley ... should now be declared to have achieved and maintained for the requisite three year period unitary status as a racially desegregated educational entity, in accordance with the procedure set forth in *Pitts v. Freeman*, 755 F.2d 1423 (11th Cir.1985).

> \*      \*      \*      \*      \*      \*

> Accordingly, the Board requests that the Court enter an Order finding that the College has been operating as a unitary entity for the requisite three year period following the adoption of a desegrega-

tion plan and ordering that the action is dismissed as to it.

In its response, Nunnelley reserved the right to present rebuttal evidence to counter any evidence suggesting that it has not achieved unitary status.

17. On November 23, 1987, the United States, plaintiff-intervenor and *amicus curiae*, also responded to the show cause order, asserting, *inter alia:*

Our review of the dockets of each case listed above [including Nunnelley], as well [as] the districts' student enrollment, staff,· and faculty statistical data covering the past several years, discloses no reason to believe that the districts have subsequently engaged in segregative conduct or otherwise violated the terms of their respective orders. Many of these orders were entered over ten years ago. We do not believe it was the intent of either the court or the parties to keep these cases on its docket indefinitely. Once a school district has fully remedied the constitutional violations committed by the district, "the district court ha[s] fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Pasadena Board of Education v. Spangler*, 427 U.S. 424, 437 [96 S.Ct. 2697, 2705, 49 L.Ed.2d 599] (1976).

Accordingly, unless any of the parties has credible evidence to the contrary, we believe that it is now appropriate for the Court to terminate all jurisdiction over these school districts, dissolve any injunctions, and dismiss the action as to them at this time.

On February 26, 1988, the United States retreated from its response of November 23, 1987, but only as to Gadsden State Community College, which was not an entity listed in the October 23, 1987 show cause order, but was added after a response objecting to a declaration of unitary status as to Gadsden State was filed. The government's position respecting Nunnelley remains the same as it stated on November 23, 1987.

18. On November 23, 1987, plaintiffs and NEA filed a motion for a continuance. In order to give plaintiffs and NEA time to prepare for a hearing, the court granted this motion on November 24, 1987. The matter was then reset for oral hearing on March 1, 1988.

19. On January 29, 1988, plaintiffs and NEA finally filed their response to the show cause order, asserting, *inter alia:*

Plaintiffs, and Plaintiff-intervenor, National Education Association, Inc., respectfully represent and show unto the Court the following:

1. That Plaintiffs have received Answers to Interrogatories propounded to each of the systems involved herein.

2. Analysis of the Interrogatories and the Answers thereto tend to indicate that the systems have not maintained a unitary status.

In truth and in fact, as became clear at the hearing, plaintiffs and NEA never propounded interrogatories to Nunnelley and never directed any discovery requests whatsoever to Nunnelley prior to the hearing held on March 1, 1988.

20. On March 1, 1988, when called upon, plaintiffs and NEA had no evidence to present for the purpose of proving or even suggesting that Nunnelley has not been a "unitary" or fully desegregated institution for well over three years, whereas Nunnelley asserted its preparedness to offer evidence to the contrary if called upon to do so.

21. On March 1, 1988, in the absence of any evidence from plaintiffs and NEA, the United States indicated that it had no objection to a finding of Nunnelley's status as a "unitary" institution. This was entirely consistent with the position which had been taken by the United States in its response filed on November 23, 1987.

22. Considering all of the circumstances outlined in paragraphs 1 through 21 above, the court orally announced from the bench on March 1, 1988, and held, that the burden was on the plaintiffs to prove that Nunnelley has not been in compliance with the prior decrees of this court for a sufficient period of time to be found "unitary."

Therefore, the court did not call upon Nunnelley to offer any evidence on the subject.

23. The court stated that a written opinion in favor of Nunnelley would be written and that an appropriate order would be entered.

### Conclusions

■ The Eleventh Circuit, discussing a long line of Fifth Circuit cases, outlined the means for bringing school desegregation cases to a conclusion, as follows:

> The courts consistently have recognized that a previously segregated dual school system does not automatically become desegregated just because a constitutionally acceptable plan is adopted and implemented. District courts must retain jurisdiction over such cases to insure not only the implementation of the desegregation plan but also "the achievement of the ultimate goal—a unitary school system...." In order to conclude a school desesegregation case, a district court must hold a hearing to determine if the school system indeed has achieved unitary status.

*Pitts v. Freeman,* 755 F.2d 1423, 1426 (11th Cir.1985) (quoting *Lee v. Macon Co. Board of Education,* 584 F.2d 78, 81 (5th Cir.1978); and citing *United States v. Texas Education Agency,* 647 F.2d 504 (5th Cir. Unit A, May 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982), and *Youngblood v. Board of Public Instruction of Bay County,* 448 F.2d 770 (5th Cir.1971)). Under these decisions, this court must retain jurisdiction over an action such as this one for a period of not less than three years following adoption of the plan of desegregation, during which the school district must file the reports ordered to allow the court to monitor implementation. *Texas Education Agency,* 647 F.2d at 508–09 (following *Youngblood,* 448 F.2d at 771). At the conclusion of this three-year period, the court should then consider whether the case should be dismissed:

> The plaintiffs should receive notice of the hearing's purpose, and the hearing should give them an opportunity to show

why the court should continue to retain jurisdiction. *Pitts,* 755 F.2d at 1426.

This court's order to show cause was directed at plaintiffs and plaintiff-intervenors. They had no reason to be surprised at this court's announcement on March 1, 1988 that the burden of proof was on them, even if they had never read *Pitts.*

Under *Pitts,* in order to conclude a school desegregation case a district court must find that the desegregation plan has resulted in

> the achievement of the ultimate goal—a unitary school system in which the State does not discriminate between public school children on the basis of race.

755 F.2d at 1426 (quoting *Lee v. Macon,* 584 F.2d at 81).

The finding that a school system or other state educational entity has achieved "unitary status" is important for several reasons. For a concise recent general discussion of the issues here implicated, see Note, *Allocating the Burden of Proof After a Finding of Unitariness in School Desegregation Litigation,* 100 Harv.L.Rev. 653 (1987).

■ "Unitary status" is a term of nouveau art. The fact that a school district or institution has ceased to operate in a racially segregated fashion, and is, therefore, "unitary" in that limited sense, is not synonymous with a finding that the entity is "fully unitary" or has achieved "unitary status," the question of status presently before this court. The Eleventh Circuit has most recently explained this difference as follows:

> [A] unitary school system is one which has not operated segregated schools as prescribed by cases such as *Swann* and *Green* for a period of several years. A school system which has achieved unitary status is one which is not only unitary but has eliminated the vestiges of prior discrimination and has been adjudicated as such through the proper judicial procedures. *Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d 1403, 1413 n. 12 (11th Cir. 1985).

In *Georgia State Conference* the Eleventh Circuit discussed one of the reasons why this distinction is important and why the declaration of unitary status is significant for the affected parties:

> Until the local defendants achieve unitary status, they have an affirmative duty to eliminate the consequences of their prior unconstitutional conduct. "[O]fficial action that has the *effect* of perpetuating or reestablishing a dual school system violates [this] duty to desegregate." Challenges to official action by a local school district which has not achieved unitary status can be successful *without proof of discriminatory intent*. The school system, however, is not obligated to adopt the most desegregative alternative available.

775 F.2d at 1414 (emphasis supplied) (citations omitted).

The old Fifth Circuit discussed the importance of a district court's holding that the school district is "unitary," as follows:

> This finding is critical because once it is made a federal court loses its power to remedy the lingering vestiges of past discrimination absent a showing that either the school authorities or the state had deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools. *United States v. South Park Independent School District,* 566 F.2d 1221, 1224 (5th Cir.1978) (citing *Swann v. Board of Education,* 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971)); *see also Lee v. Macon,* 584 F.2d at 81.

The scope of a district court's remedial power after the entry of an order declaring unitary status and after closing or dismissing a desegregation case has been the subject of recent decisions by the Eleventh, Fifth, First, Tenth, and Fourth Circuits, resulting in varying interpretations of the district court's role. These cases discussing the implications and repercussions of entering a finding of "unitariness" are: *United States v. Board of Education of Jackson County,* 794 F.2d 1541 (11th Cir. 1986); *United States v. Overton,* 834 F.2d 1171 (5th Cir.1987); *Morgan v. Nucci,* 831 F.2d 313 (1st Cir.1987); *Dowell v. Board of Education of Oklahoma City,* 795 F.2d 1516 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1987); and *Riddick v. School Board,* 784 F.2d 521 (4th Cir.1986) *cert. denied,* —— U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1987).

Plaintiffs and NEA have not urged the court to adopt the position advanced by the Tenth Circuit in *Dowell v. Board of Education of Oklahoma, supra,* in regard to Nunnelley, but *Dowell* arguably would provide a rationale for this court's continued supervisory jurisdiction beyond a finding of "unitariness." The *Dowell* court found that the district court always retains the authority to enforce a mandatory injunction adopting a student reassignment plan, concluding that the effect of that order is not altered by a subsequent order terminating the court's active supervision of the case upon attainment of "unitary status." The *Dowell* court reasoned that it was only when the order terminating active supervision also *dissolves* the mandatory injunction that the school board regains total independence from the previous injunction. 795 F.2d at 1520–21. This court does not necessarily disagree with this approach, but points out that the order which will be entered by this court in Nunnelley's case will obviate this question.

The *Dowell* position is in stark contrast to the positions of the Fifth, Fourth, and First Circuits, which are discussed in Judge Higginbotham's clear and convincing opinion for the Fifth Circuit in *United States v. Overton, supra.* Judge Higginbotham, in rejecting the *Dowell* view, summed up the Fifth Circuit position on the subject, stating:

> [T]he idea that a school district can be declared unitary and yet be answerable to the federal courts for failure to abide by desegregation plans, regardless of segregative purpose, is at war with itself. When the federal court, with full agreement of all parties and in full compliance with our rules, declared Austin Independent School System unitary, it released the school district from federal judicial superintendence, leaving it on the

same footing with other state actors. Thus we can find no fault with either the district court's refusal to reopen the *Overton* litigation or its unwillingness to enforce a consent decree that had already lapsed. 834 F.2d at 1177.

In *Morgan v. Nucci, supra,* the First Circuit discussed the concept of unitary status as it pertains to the long-standing Boston schools desegregation litigation. The *Morgan* court wisely found that the district court had fully performed its supervisory role and should relinquish its supervision of the student assignments phase of the desegregation program upon a finding that the Boston student assignment process had achieved unitary status, even though other areas of the desegregation order had not attained that level of compliance. The district court was therefore found to be justified in relinquishing its jurisdiction over any phase of the operations found to be "unitary." 831 F.2d at 318–319.

The Fourth Circuit in *Riddick v. School Board, supra,* found that once the goal of a unitary school system is achieved, the district court's role ends. 784 F.2d at 535. This position was cited with approval by Judge Higginbotham in *Overton.* 834 F.2d at 1174.

The Eleventh Circuit seems to have taken a middle ground between these two extremes. In a somewhat cryptic opinion in *United States v. Board of Education of Jackson County, supra,* the Eleventh Circuit dealt with the fact that the Board of Education of Jackson County, Georgia, had sought to vacate a 1980 desegregation order after the end of a three-year period during which the system had maintained unitary status. The court, under the peculiar and limited facts of that case, stated:

> That school districts have become unitary, however, does not inevitably require the courts to vacate the orders upon which the parties had relied in reaching that state. Our cases do not require the premature termination of those long-term orders that are part of a remedy "tailored to cure" a particular constitutional wrong. In some situa-

tions, such orders make possible the long term commitment needed to start the desegregation process.

794 F.2d at 1543. Of course, there is a marked difference between an "inevitable requirement" and a considered judgment. And there is also a marked difference between what may be needed "to start the desegregation process" and what may be needed to recognize its satisfactory completion.

The *Jackson* court rejected what it termed the government's "overly rigid interpretation" of the earlier decisions in *Youngblood, supra,* and *Lee v. Macon County, supra,* when the government argued that all orders flowing from desegregation suits must be vacated contemporaneously with the dismissal of the suits, and that the unitary nature of the school districts removes any basis for continuing jurisdiction. Despite the leeway *Jackson* leaves to district courts, *Jackson,* on its facts, cannot be construed to invite or command indefinite and continued district court involvement to monitor and enforce earlier court orders once the declaration of unitary status has led to a dismissal of the action, as is about to happen here.

These case summaries perhaps oversimplify the complexities embraced within the issue of "unitariness," but they suffice for the limited purpose of outlining the appellate expressions which lead this court to a finding of "unitariness" regarding the aspects of the previous desegregation orders directed at Nunnelley, and which lead this court to a termination of supervision over Nunnelley. "Unitariness" has never been satisfactorily defined by any court, although many courts, including the Supreme Court, have tried. The word still has many of the aspects of a "will-o-the-wisp." For instance, is "unitariness" to be measured in a purely mechanical or arithmetical way, or is there an "attitude" or "good faith" component which also must be measured? And does the concept of "unitariness" change along with changing demographics and with the growth of private schools? From reading the decisions and the newspapers it becomes obvious that the

courts apply the concept of "unitariness" on an *ad hoc,* case-by-case basis, exercising considerable discretion in applying it. This approach is not only unavoidable, but wise.

■ During the hearing held on March 1, 1988, plaintiffs and NEA argued that the burden of proving unitary status remained upon Nunnelley and upon the other instructional entities not previously expressly released from *Lee v. Macon.* There are several good answers to this argument. First, the language of *Pitts,* quoted above, and *Youngblood,* suggests that plaintiffs must go forward with proof under these circumstances. Second, plaintiff-intervenor, United States, obviously disagrees with plaintiffs and with NEA, its fellow plaintiff-intervenor. The United States says that unless credible evidence is presented to disprove an existing unitary status after this long lapse of time, unitary status should be acknowledged by this court and the injunction should be lifted as to those institutions found to have achieved such status. Next, the fact that the reports routinely filed by Nunnelley have never been challenged or criticized by plaintiffs necessarily creates a presumption that these reports indicate compliance by Nunnelley on schedule. Next, the order of October 23, 1987, expressly alerted plaintiffs that the court expected them to come forward with evidence to disprove "unitariness." Last, if the burden is on each educational entity ultimately to prove its own "perfection" as a desegregated entity in all respects ("perfection" being an unreachable goal) before being released from the injunction, court supervision will go on forever. Logically, there must be some obligation on plaintiffs and upon their counsel, who sought and obtained this extremely important class relief, to monitor the reports filed by the various defendant entities, and to force compliance with the decrees which plaintiffs succeeded in obtaining. In fact, plaintiffs have from time to time here actually sought supplementary relief when they believed that they had discovered shortcomings by particular covered entities. Except for serving as an official repository for the ordered periodic reports, this court does not claim the logistical capability for ascertaining, on its own, the levels of compliance achieved by each supervised institution or system. Another judge of this court in a similar case involving class relief obtained for civil rights violations, *Pearson v. Calhoun County, Alabama,* No. CV 78–H–1086–E (N.D.Ala. Oct. 2, 1985), found that a continuing obligation is imposed on counsel who successfully represent a plaintiff class to follow up and to work at guaranteeing enforcement of the terms of a decree which grants long term relief. In other words, plaintiffs' counsel cannot sit back and blithely assume that their victory will stay won. A plaintiff class, which for ten (10) years makes no claim that Nunnelley is in non-compliance should not be heard suddenly to argue, in response to a *sua sponte* show cause order, that the burden is forever on Nunnelley to prove its compliance and purity. This principle is appropriate, whether the rationale for shifting the burden to plaintiffs after ten (10) years is estoppel, laches, fundamental fairness, or prudence of the "juris" variety.

■ There are many reasons why the ancient injunction and supervision by this court should not remain open-ended and should not last forever or until one of the enjoined parties itself courageously precipitates a court response, as Talladega County Board of Education did in 1985 at some risk. This court could "let sleeping dogs lie," but it has a responsibility to bring litigation to a real conclusion in which the files stay closed. Further, these files are by now so large and so stale that any time they come open there is an enormous expenditure of judicial time simply to understand where the court and the parties find themselves. This court seriously doubts that the parties know where they are. In fact, there has been such a turnover of lawyers and personnel in positions of responsibility within the institutions and systems affected, that some of the supervised entities appeared at the hearing on March 1, 1988, without seeming to know where to locate their ancient desegregation plans, and the court itself has been unable to locate all of them in the files. Also, employees of the various entities which are

permanently enjoined from racially discriminating in hiring and employee assignments and promotion policies, who wish to complain of certain actions or practices, do not know whether to do so under Title VII and/or 42 U.S.C. § 1983, or to intervene in *Lee v. Macon*, as the purported beneficiaries of the permanent injunctions of this court, seeking to hold the employer in contempt or to obtain other appropriate relief under *Lee v. Macon*. Do the named plaintiffs, as class representatives (even though they may long since have graduated, retired, or died), have a continuing obligation to enforce the equitable relief which they long ago obtained on behalf of the class when and if some individual class member (who perhaps was not alive when the injunction issued) complains, or does a class member have personal standing to claim the class-based relief ten or twenty years later for his personal benefit and simultaneously to claim an exemption from any EEOC conciliation prerequisite? This equivocal situation constantly causes confusion. The argument has often been made that *Lee v. Macon* is the only vehicle by which an employee of a state school entity subject to desegregation orders can obtain relief from racial discrimination in employment. *See Davis v. Board of Commissioners of Mobile County*, 517 F.2d 1044 (5th Cir.1975); *cf. Lee v. Tuscaloosa County Board of Education*, 591 F.2d 324 (5th Cir.1979). On the other hand, the public employers insist that their employees and job applicants must first invoke their EEOC remedy and file a Title VII claim. An apt illustration of this dilemma occurred this week in this very case, where this court entered a consent decree after allowing the intervention of a black teacher at one of the institutions still under the supervisory control of this court, although that teacher simultaneously traveled the EEOC track. Did he need to travel only one track, or was he understandably over-exploiting our judicial and/or administrative resources because he was unsure of the track he should be on? It makes considerable sense to treat the victims of racial discrimination in employment in the same manner whether the alleged act of discrimination is perpetrated by a state educational institution or by some other employer, private or public, not laboring under a twenty-year-old permanent injunction.

For all of the foregoing reasons, the court will enter a separate order finding that Nunnelley has reached and maintained a desegregation plateau sufficient to "kick it out of the nest" of federal court supervision.